**APPALACHIAN POWER COMPANY,
et al., Petitioners,**

v.

**ENVIRONMENTAL PROTECTION
AGENCY, Respondent.**

Nos. 98–1512, 98–1536—98–1538,
98–1540 & 98–1542.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 8, 2000.

Decided April 14, 2000.

Lauren E. Freeman argued the cause for petitioners. With her on the briefs were Henry V. Nickel, Leslie Sue Ritts, Michael H. Levin, Edmund B. Frost, David F. Zoll, Alexandra Dapolito Dunn, John Reese, Charles F. Lettow, Marcilynn A. Burke, L. Burton Davis, William H. Lewis, Michael A. McCord and Ellen Siegler. Michael P. McGovern and Neal J. Cabral entered appearances.

Jon M. Lipshultz, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the briefs were Lois J. Schiffer, Assistant Attorney General, and Gregory B. Foote, Attorney, Environmental Protection Agency.

Before: WILLIAMS, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

These consolidated petitions for judicial review, brought by electric power companies, and trade associations representing the nation's chemical and petroleum industry, challenge the validity of portions of an EPA document entitled "Periodic Monitoring Guidance," released in 1998. In the alternative, petitioners seek review of a 1992 EPA rule implementing Title V of the Clean Air Amendments of 1990.

## I.

Title V of the 1990 amendments to the Clean Air Act altered the method by which government regulated the private sector to control air pollution. Henceforth, stationary sources of air pollution, or of potential air pollution, must obtain operating permits from State or local authorities administering their EPA-approved implementation plans. The States must submit to EPA for its review all operating permits and proposed and final permits. *See* 42 U.S.C. § 7661d. EPA has 45 days to object; if it does so, "the permitting authority may not issue the permit," *id.* § 7661d(b)(3).[1] Congress instructed EPA to pass regulations establishing the "minimum elements of a permit program to be administered by any air pollution control agency," including "Monitoring and reporting requirements." 42 U.S.C. § 7661a(b). Under Title V, the Governor of each State could submit to EPA a permit program by November 15, 1993, to comply with Title V and with whatever regulations EPA had promulgated in the interim. *See* 42 U.S.C. § 7661a(d). This was to be accompanied by a legal opinion from the State's attorney general that the laws of the State contained sufficient authority to authorize the State to implement the program. *Id.* If a State decided not to participate, or if EPA disapproved the State's program, federal sanctions would kick in, including a cut-off of federal highway funds and an EPA takeover of permit-issuing authority within the State. *See Commonwealth of Virginia v. Browner,* 80 F.3d 869, 873–74 (4th Cir.1996).

EPA promulgated rules implementing the Title V permit program in 1992. The rules list the items each State permit program must contain,[2] including this one:

(3) *Monitoring and related record-keeping and reporting requirements.* (i) Each permit shall contain the following requirements with respect to monitoring:

(A) All monitoring and analysis procedures or test methods required under applicable monitoring and testing requirements, including part 64 of this chapter and any other procedures and methods that may be promulgated pursuant to sections 114(a)(3) or 504(b) of the Act. If more than one monitoring or testing requirement applies, the permit may specify a streamlined set of monitoring or testing provisions provided the specified monitoring or testing is adequate to assure compliance at least to the same extent as the monitoring or testing applicable requirements that are not included in the permit as a result of such streamlining;

(B) Where the applicable requirement does not require periodic testing or instrumental or noninstrumental monitor-

---

1. If the State permitting authority fails to revise the permit to satisfy EPA's objection, EPA shall issue or deny the permit, at which point EPA's action becomes subject to judicial review. *See* 42 U.S.C. § 7661d(c).

2. The list is nicely summarized in DAVID R. WOOLEY, CLEAN AIR ACT HANDBOOK: A PRACTICAL GUIDE TO COMPLIANCE § 5.02[1] (9th ed.2000).

ing (which may consist of record-keeping designed to serve as monitoring), periodic monitoring sufficient to yield reliable data from the relevant time period that are representative of the source's compliance with the permit, as reported pursuant to paragraph (a)(3)(iii) of this section. Such monitoring requirements shall assure use of terms, test methods, units, averaging periods, and other statistical conventions consistent with the applicable requirement. Recordkeeping provisions may be sufficient to meet the requirements of this paragraph (a)(3)(i)(B) of this section; and

(C) As necessary, requirements concerning the use, maintenance, and, where appropriate, installation of monitoring equipment or methods....

40 C.F.R. § 70.6(a)(3).

The key language—key because this dispute revolves around it—is in the first sentence of § 70.6(a)(3)(i)(B). Permits contain terms and conditions with which the regulated entities must comply. Some of the terms and conditions—in regulatory lingo, "applicable requirements" (*see* § 70.6(a)(3)(i)(B))[3]—consist of emission limitations and standards, State and federal. Experts in the field know that federal emission standards, such as those issued for hazardous air pollutants and new stationary sources, contain far more than sim-

ply limits on the amount of pollutants emitted.

Take for instance the following examples drawn at random from the Code of Federal Regulations. The national emission standard for hazardous air pollutants from primary lead smelting is contained in 40 C.F.R. §§ 63.1541–.1550. In addition to emission limits,[4] the operator must comply with detailed and extensive testing requirements contained in § 63.8 of the regulations, and must monitor certain pressure drops daily; make weekly checks to ensure that dust is being removed from hoppers; perform quarterly inspections of fans, and so forth. *Id.* § 63.1547. Or consider the standards of performance for new stationary sources contained in 40 C.F.R. part 60, one of the thickest of the dozen or so volumes EPA commands in the C.F.R. In the "beverage can surface coating industry," those subject to these regulations must—if they use "a capture system and an incinerator"—install some sort of "temperature measurement device," properly calibrated and having a specified accuracy stated in terms of degrees Celsius. 40 C.F.R. § 60.494.[5] Or if the new source is in the rubber tire manufacturing industry, an operator doing a "green tire spraying operation" using organic solvent-based sprays must install "an organics monitoring device used to indicate the concentration level of organic com-

3. One EPA official explained:
   Permits must incorporate terms and conditions to assure compliance with all applicable requirements under the Act, including the [state implementation plan], title VI, sections 111 and 112, the sulfur dioxide allowance system and $NO_x$ limits under the acid rain program, emission limits applicable to the source, monitoring, recordkeeping and reporting requirements, and any other federally-recognized requirements applicable to the source.
   John S. Seitz, Director, Office of Air Quality Planning and Standards, *Developing Approvable State Enabling Legislation Required to Implement Title V*, at p. 4 (Feb. 25, 1993).

4. *See* 40 C.F.R. § 63.1543(a):
   No owner or operator of any existing, new, or reconstructed primary lead smelter shall discharge or cause to be discharged

into the atmosphere lead compounds in excess of 500 grams of lead per megagram of lead metal produced ... from the aggregation of emissions discharged from the air pollution control devices used to control emissions from the sources [listed].

5. If the facility does not use a capture system, it must calculate its emission limits using a series of equations provided by EPA. For some idea of the complexity of this exercise, consider that the facility must figure its total volume of coating solids per month using the following equation:

$$s = \sum_{i=1}^{n} c_i V_{si}$$

40 C.F.R. § 60.493(b)(1)(i)(B). It would serve no useful purpose to explain this or the many other equations in the sequence.

pounds based on a detection principle such as infrared ..., equipped with a continuous recorder, for the outlet of the carbon bed." *Id.* § 60.544(a)(3).

Typically, EPA delegates to the States its authority to require companies to comply with these federal standards. The States incorporate the federal standards in their implementation plans and, under Title V of the 1990 law, the applicable standards become terms and conditions in permits. States too have their own emissions limitations and standards in their implementation plans, which they need in order to comply with national ambient air quality standards. *See* 40 C.F.R. part 52; *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 846, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Union Electric Co. v. EPA,* 427 U.S. 246, 249–50, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976); *Commonwealth of Virginia v. EPA,* 108 F.3d 1397, 1406 (D.C.Cir.), *modified,* 116 F.3d 499 (D.C.Cir.1997). Petitioners tell us that States may formulate their emission standards not only by limiting the amount of air pollutants, but also by imposing practices, including the monitoring of emissions.[6]

On one thing the parties are in agreement. If an applicable State emission standard contains no monitoring requirement to ensure compliance, EPA's regulation requires the State permitting agency to impose on the stationary source some sort of "periodic monitoring" as a condition in the permit or specify a reasonable frequency for any data collection mandate already specified in the applicable requirement. According to petitioners this sort of gap-filling is all § 70.6(a)(3)(i)(B)—the so-called periodic monitoring rule—requires of State permit programs. By petitioners'

lights, if a federal or State emission standard already contains some sort of requirement to do testing[7] from time to time, this portion of the standard must be incorporated in the permit, not changed by the State to conform to EPA's imprecise and evolving notion of what constitutes "periodic monitoring."[8] Otherwise, State authorities will wind up amending federal emission standards in individual permits, something not even EPA could do without conducting individual rulemakings to amend the regulations containing the federal standards. And with respect to State standards, the State agency will in effect be revising its implementation plan at EPA's behest, without going through the procedures needed to accomplish this. *See, e.g.,* 42 U.S.C. § 7410(k)(5) & (*l*).

In a document entitled "Periodic Monitoring Guidance for Title V Operating Permits Programs," released in September 1998, EPA took a sharply different view of § 70.6(a)(3) than do petitioners. The "Guidance" was issued over the signature of two EPA officials—the Director of the Office of Regulatory Enforcement, and the Director of the Office of Air Quality Planning and Standards. It is narrative in form, consists of 19 single-spaced, typewritten pages, and is available on EPA's internet web site (www.epa.gov). "Periodic monitoring," the Guidance states, "is required for each emission point at a source subject to title V of the Act that is subject to an applicable requirement, such as a Federal regulation or a SIP emission limitation." PERIODIC MONITORING GUIDANCE FOR TITLE V OPERATING PERMITS PROGRAMS (hereinafter "GUIDANCE") at 5. New source performance standards, and national emission standards for hazardous pollutants, if EPA promulgated the standards after November 15, 1990, the effective date of the

---

6. In some instances, States may adopt emission standards or limitations that are more stringent than federal standards. 42 U.S.C. § 7416. States may also adopt more stringent permit requirements. 40 C.F.R. § 70.1(c).

7. By testing we mean to include instrumental and noninstrumental monitoring as well.

8. In support of their view, petitioners point to the Title V rule's preamble which states: "If the underlying applicable requirement imposes a requirement to do periodic monitoring or testing ..., the permit must simpl[y] incorporate this provision under § 70.6(a)(3)(i)(A)." 57 Fed.Reg. 32,278 (1992).

Clean Air Act amendments, are "presumed to have adequate monitoring." *Id.* Also, for "emission units subject to the acid rain requirements," EPA has determined that its "regulations contain sufficient monitoring for the acid rain requirements." *Id.* Outside of these categories and one other, the Guidance states that "periodic monitoring is required ... when the applicable requirement does not require ... monitoring sufficient to yield reliable data from the relevant time period that are representative of the source's compliance with the permit." *Id.* at 6. How to determine this? Clearly, according to the Guidance, if an "applicable requirement imposes a one-time testing requirement, periodic monitoring is not satisfied ...," presumably because one time is not from time to time, which is what periodic means. *Id.*

## II.

The phenomenon we see in this case is familiar. Congress passes a broadly worded statute. The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like. Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations. One guidance document may yield another and then another and so on. Several words in a regulation may spawn hundreds of pages of text as the agency offers more and more detail regarding what its regulations demand of regulated entities. Law is made, without notice and

comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations. With the advent of the Internet, the agency does not need these official publications to ensure widespread circulation; it can inform those affected simply by posting its new guidance or memoranda or policy statement on its web site. An agency operating in this way gains a large advantage. "It can issue or amend its real rules, i.e., its interpretative rules and policy statements, quickly and inexpensively without following any statutorily prescribed procedures." Richard J. Pierce, Jr., *Seven Ways to Deossify Agency Rulemaking*, 47 ADMIN. L.REV. 59, 85 (1995).[9] The agency may also think there is another advantage—immunizing its lawmaking from judicial review.

## A.

■■■■ EPA tells us that its Periodic Monitoring Guidance is not subject to judicial review because it is not final, and it is not final because it is not "binding."[10] Brief of Respondent at 30. *See* GUIDANCE at 19. It is worth pausing a minute to consider what is meant by "binding" in this context. Only "legislative rules" have the force and effect of law. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 & n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). A "legislative rule" is one the agency has duly promulgated in compliance with the procedures laid down in the statute or in the Administrative Procedure Act.[11] If this were all that "binding" meant, EPA's

---

9. How much more efficient than, for instance, the sixty rounds of notice and comment rulemaking preceding the final rule in *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

10. Our jurisdiction extends to "any ... nationally applicable ... final action taken by" the EPA "Administrator." 42 U.S.C. § 7607(b)(1). The Guidance issued over the signatures of two high level EPA officials rather than the Administrator. EPA does not, however, contest petitioners' assertion that because "the document was drafted, and reviewed by, high ranking officials in several EPA offices, including EPA's lawyers, there is

no reason to doubt the authors' authority to speak for the Agency." Brief of Petitioners at 42. *See Her Majesty the Queen v. EPA*, 912 F.2d 1525, 1531–32 (D.C.Cir.1990); *Natural Resources Defense Council, Inc. v. Thomas*, 845 F.2d 1088, 1094 (D.C.Cir.1988).

11. We have also used "legislative rule" to refer to rules the agency should have, but did not, promulgate through notice and comment rulemaking. *See, e.g., American Mining Congress v. Department of Labor*, 995 F.2d 1106, 1110 (D.C.Cir.1993). In this case, by "rule" we mean the following:

   ... the whole or a part of an agency statement of general or particular applicability

Periodic Monitoring Guidance could not possibly qualify: it was not the product of notice and comment rulemaking in accordance with the Clean Air Act, 42 U.S.C. § 7607(d), and it has not been published in the Federal Register.[12] But we have also recognized that an agency's other pronouncements can, as a practical matter, have a binding effect. *See, e.g., McLouth Steel Prods. Corp. v. Thomas,* 838 F.2d 1317, 1321 (D.C.Cir.1988). If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding." *See* Robert A. Anthony, *Interpretative Rules, Policy Statements, Guidances, Manuals, and the Like—*

*Should Federal Agencies Use Them to Bind the Public?,* 41 DUKE L.J. 1311, 1328–29 (1992), and cases there cited.

■ For these reasons, EPA's contention must be that the Periodic Monitoring Guidance is not binding in a practical sense. Even this, however, is not an accurate way of putting the matter. Petitioners are not challenging the Guidance in its entirety. Under the Administrative Procedure Act, a "rule" may consist of "part of an agency statement of general or particular applicability and future effect. . . ." 5 U.S.C. § 551(4), quoted in full in *supra* note 11; *see* 5 U.S.C. §§ 551(13), 702. "Interpretative rules" and "policy statements" may be rules within the meaning of the APA and the Clean Air Act, although neither type of "rule" has to be promulgated through notice and comment rulemaking. *See* 42 U.S.C. § 7607(d)(1), referring to 5 U.S.C. § 553(b)(A) & (B).[13] EPA claims, on the one hand, that the Guidance is a policy statement, rather than an interpretative rule, and is not binding.[14] On

and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. . . .
5 U.S.C. § 551(4).

12. 5 U.S.C. § 552(a)(1)(D) requires publication in the Federal Register of all "interpretations of general applicability." *Compare* 5 U.S.C. § 552(a)(2)(B), requiring agencies to make available for inspection and copying "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register."

13. We quoted, in *Panhandle Eastern Pipe Line Co. v. FERC,* 198 F.3d 266, 269 (D.C.Cir. 1999), the statement in *Pacific Gas & Elec. Co. v. Federal Power Commission,* 506 F.2d 33, 38 (D.C. Cir.1974), that a policy statement is not a "rule," apparently within the meaning of 5 U.S.C. § 551(4). Dicta in *Syncor International Corp. v. Shalala,* 127 F.3d 90, 94 (D.C.Cir.1997), suggests the same without referring to § 551(4). *See also Hudson v. FAA,* 192 F.3d 1031 (D.C.Cir.1999).

On the other hand, in *Batterton v. Marshall,* 648 F.2d 694, 700 (D.C.Cir.1980), we interpreted the term "rule" in § 551(4) as "broad enough to include nearly every statement an agency may make. . . ." Quoting this lan-

guage, we held in *Center for Auto Safety v. National Highway Traffic Safety Administration,* 710 F.2d 842, 846 (D.C.Cir.1983), that agency policy statements accompanying the withdrawal of a notice of proposed rulemaking fell within the definition of a "rule." A few years later, then-Judge Scalia—citing *Batterton*—wrote for the court that under APA § 551(4), it is "clear" that "the impact of an agency statement upon private parties is relevant only to whether it is the sort of rule that is . . . a general statement of policy." *Thomas v. New York,* 802 F.2d 1443, 1447 n. * (D.C.Cir.1986). *See also National Tank Truck Carriers, Inc. v. Federal Highway Admin.,* 170 F.3d 203, 207 n. 3 (D.C.Cir.1999).

There is no need for us to try to reconcile these two lines of authority. Nothing critical turns on whether we initially characterize the Guidance as a "rule."

14. EPA is under the impression that policy statements can never be "rules" within the meaning of APA § 551(4): "even if the Guidance were somehow deemed to be a 'rule' (a conclusion that would, in EPA's view, be erroneous due to the non-binding nature of the Guidance), Petitioners' procedural challenge would still fail because the Guidance undoubtedly would be an interpretive (not legislative) rule. . . ." Brief of Respondent at 43–44 n.40.

the other hand, EPA agrees with petitioners that "the Agency's position on the central legal issue here—the appropriateness of a sufficiency review of all Title V monitoring requirements—indeed is settled. . . ." Brief of Respondent at 32. In other words, whatever EPA may think of its Guidance generally, the elements of the Guidance petitioners challenge consist of the agency's settled position, a position it plans to follow in reviewing State-issued permits, a position it will insist State and local authorities comply with in setting the terms and conditions of permits issued to petitioners, a position EPA officials in the field are bound to apply.

■ Of course, an agency's action is not necessarily final merely because it is binding.[15] Judicial orders can be binding; a temporary restraining order, for instance, compels compliance but it does not finally decide the case. In the administrative setting, "two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow,' *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970)." *Bennett v. Spear*, 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The first condition is satisfied here. The "Guidance," as

issued in September 1998, followed a draft circulated four years earlier and another, more extensive draft circulated in May 1998. This latter document bore the title *"EPA Draft Final Periodic Monitoring Guidance."*[16] On the question whether States must review their emission standards and the emission standards EPA has promulgated to determine if the standards provide enough monitoring, the Guidance is unequivocal—the State agencies must do so. *See* GUIDANCE at 6–8. On the question whether the States may supersede federal and State standards and insert additional monitoring requirements as terms or conditions of a permit, the Guidance is certain—the State agencies must do so if they believe existing requirements are inadequate, as measured by EPA's multi-factor, case-by-case analysis set forth in the Guidance. *See* GUIDANCE at 7–8.

■ EPA may think that because the Guidance, in all its particulars, is subject to change, it is not binding and therefore not final action. There are suggestions in its brief to this effect. *See, e.g.,* Brief of Respondent at 3, 33 n.30. But all laws are subject to change. Even that most enduring of documents, the Constitution of the United States, may be amended from time to time. The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment. *See McLouth Steel Prods. Corp. v. EPA,* 838 F.2d at 1320.

On the issue whether the challenged portion of the Guidance has legal consequences, EPA points to the concluding paragraph of the document, which contains

---

We should note that the Guidance itself states that it "interprets" § 70.6(a)(3) of the regulations. GUIDANCE at 4 n.1.

**15.** We add that agency action does not necessarily have binding effect—that is, does not necessarily alter legal rights and obligations—merely because it is final. Denials of petitions for rulemaking, for instance, may be final although no private person is required to do anything. In the past, when this court examined the binding effect of agency action, we did so for the purpose of determining whether the non-legislative rule should have

undergone notice and comment rulemaking because it was, in effect, a regulation. *See, e.g., Florida Power & Light Co. v. EPA,* 145 F.3d 1414, 1418–19 (D.C.Cir.1998); *American Portland Cement Alliance v. EPA,* 101 F.3d 772, 776 (D.C.Cir.1996); *Kennecott Utah Copper Corp. v. Dep't of Interior,* 88 F.3d 1191, 1207 (D.C.Cir.1996); *National Solid Waste Mgmt. Ass'n v. EPA,* 869 F.2d 1526, 1534 (D.C.Cir.1989).

**16.** In the title to the Guidance we have before us, EPA dropped the word "final."

a disclaimer: "The policies set forth in this paper are intended solely as guidance, do not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party." GUIDANCE at 19. This language is boilerplate; since 1991 EPA has been placing it at the end of all its guidance documents. *See* Robert A. Anthony, *supra*, 41 DUKE L.J. at 1361; Peter L. Strauss, Comment, *The Rulemaking Continuum*, 41 DUKE L.J. 1463, 1485 (1992) (referring to EPA's notice as "a charade, intended to keep the proceduralizing courts at bay"). Insofar as the "policies" mentioned in the disclaimer consist of requiring State permitting authorities to search for deficiencies in existing monitoring regulations and replace them through terms and conditions of a permit, "rights" may not be created but "obligations" certainly are—obligations on the part of the State regulators and those they regulate. At any rate, the entire Guidance, from beginning to end—except the last paragraph—reads like a ukase. It commands, it requires, it orders, it dictates. Through the Guidance, EPA has given the States their "marching orders" and EPA expects the States to fall in line, as all have done, save perhaps Florida and Texas. *See Natural Resources Defense Council, Inc. v. Thomas*, 845 F.2d 1088, 1094 (D.C.Cir. 1988); *Community Nutrition Inst. v. Young*, 818 F.2d 943, 947–48 (D.C.Cir. 1987).

Petitioners tell us, and EPA does not dispute, that many of them are negotiating their Title V permits, that State authorities, with EPA's Guidance in hand, are insisting on continuous opacity monitors[17] for determining compliance with opacity limitations although the applicable "standard specifies EPA Method 9 (a visual observation method) as the compliance method (and, in some cases, already provides for periodic performance of that method)." Brief of Petitioners at 43–44. *See Natural Resources Defense Council, Inc. v. EPA*, 22 F.3d 1125, 1133 (D.C.Cir. 1994).

◼ The short of the matter is that the Guidance, insofar as relevant here, is final agency action, reflecting a settled agency position which has legal consequences both for State agencies administering their permit programs and for companies like those represented by petitioners who must obtain Title V permits in order to continue operating.[18]

### B.

As to the validity of the Guidance, petitioners' arguments unfold in the following sequence. First, they contend that the Guidance amended the "periodic monitoring rule" of § 70.6(a)(3)(i)(B). Although the rule only allowed State authorities to fill in gaps, that is, to require periodic monitoring when the applicable State emission standard contained no monitoring requirement, a one-time startup test, or provided no frequency for monitoring, the Guidance applies across the board, charging State authorities with the duty of assessing the sufficiency of all State and federal standards.[19] With the Guidance in

17. A continuous opacity monitor employs "a calibrated light source that provides for accurate and precise measurement of opacity at all times." *See* Credible Evidence Revisions, 62 Fed.Reg. 8319 (1997). In contrast, "Method 9 requires that a trained visible emissions observer (VEO) view a smoke plume with the sun at a certain angle to the plume" to determine the opacity of the plume released. *Id.*

18. EPA also claims that the Guidance is not ripe for review because the court's review would be more focused in the context of a challenge to a particular permit. We think there is nothing to this. Whether EPA properly instructed State authorities to conduct

sufficiency reviews of existing State and federal standards and to make those standards more stringent if not enough monitoring was provided will not turn on the specifics of any particular permit. Furthermore, EPA's action is national in scope and Congress clearly intended this court to determine the validity of such EPA actions. *See* 42 U.S.C. § 7607. A challenge to an individual permit would not be heard in this court. (Petitioners contend that only state courts could adjudicate such cases. We express no view about that.)

19. Petitioners also claim that the Guidance revised EPA's "Compliance Assurance Monitoring" rule, sustained in *Natural Resources*

place, regional EPA offices have solid legal grounds for objecting to State-issued permits if the State authorities refuse to bend to EPA's will. Therefore, as petitioners see it, the Guidance is far more than a mere interpretation of the periodic monitoring rule and it is far more than merely a policy statement. In practical effect, it creates a new regime, a new legal system governing permits, and as such it should have been, but was not, promulgated in compliance with notice and comment rulemaking procedures. Petitioners say that if they are wrong about this, if the Guidance represents a valid interpretation of the periodic monitoring rule in § 70.6(a)(3)(i)(B), then the rule itself is invalid. Congress did not authorize EPA to require States, in issuing Title V permits, to make revisions to monitoring requirements in existing federal emission standards.

The case is presented to us in pure abstraction. Neither side cites any specific federal or State emission standard. Although petitioners complain that State officials will revise federal standards promulgated before November 1990, petitioners' briefs identify no specific federal standard potentially subject to revision. Which, if any, federal standards are susceptible to State revision in a permit for lack of periodic monitoring is thus something about which we can only guess. The same is true regarding State emission standards.

Perhaps petitioners should not be faulted. They disagree with EPA's general principle, with the agency's position that it can give State permit officials the authority to substitute new monitoring requirements in place of existing State or federal emission standards already containing some sort of monitoring requirements.

The validity of that general principle does not turn on the specifics of any particular emission standard, although its application does. Besides, EPA is currently developing even more detail in far more extensive "guidance" using concrete examples of what would, and would not, constitute "periodic monitoring" in EPA's opinion. *See* Draft—Periodic Monitoring Technical Reference Document (Apr. 30, 1999).

■ It is well-established that an agency may not escape the notice and comment requirements (here, of 42 U.S.C. § 7607(d)) by labeling a major substantive legal addition to a rule a mere interpretation. *See Paralyzed Veterans v. D.C. Arena L.P.,* 117 F.3d 579, 588 (D.C.Cir.1997); *American Mining Congress v. MSHA,* 995 F.2d 1106, 1109–10 (D.C.Cir.1993). "We must still look to whether the interpretation itself carries the force and effect of law, ... or rather whether it spells out a duty fairly encompassed within the regulation that the interpretation purports to construe." (citations and internal quotations omitted). *See Paralyzed Veterans,* 117 F.3d at 588. With that in mind, we will deal first with petitioners' claim that the Guidance significantly expanded the scope of the periodic monitoring rule. Section 70.6(a)(3)(i)(B) tells us that "periodic monitoring" must be made part of the permit when the applicable State or federal standard does not provide for "periodic testing or instrumental or noninstrumental monitoring."[20] If "periodic" has its usual meaning,[21] this signifies that any State or federal standard requiring testing from time to time—that is yearly, monthly, weekly, daily, hourly—would be satisfactory. The supplementing authority in § 70.6(a)(3)(i)(B) therefore would not be

*Defense Council, Inc. v. EPA,* 194 F.3d 130 (D.C.Cir.1999), an argument we find unnecessary to consider.

**20.** EPA identified the source of its authority for § 70.6(a)(3) as 42 U.S.C. § 7661c(b). This provides that EPA "may by rule" set forth methods and procedures "for monitoring and analysis of pollutants regulated under this chapter, but continuous emissions monitoring

need not be required if alternative methods are available that provide sufficiently reliable and timely information for determining compliance."

**21.** Although EPA defined many terms in its regulations governing permits, 40 C.F.R. § 70.2, it provided no definition of "periodic" or of "monitoring."

triggered; instead, the emission standard would simply be incorporated in the permit, as EPA acknowledged in the rule's preamble, *see supra* note 8. On the other hand, if the State or federal standard contained merely a one-time startup test, specified no frequency for monitoring or provided no compliance method at all, § 70.6(a)(3)(i)(B) would require the State authorities to specify that some testing be performed at regular intervals to give assurance that the company is complying with emission limitations.

So far, our parsing of the language of § 70.6(a)(3)(i)(B) corresponds with petitioners' view that the rule serves only a gap-filling function. If this is what the rule means, there is no doubt that it is much narrower than the Guidance issued in 1998. There, EPA officials stated that regardless whether an emission standard contained a "periodic testing" or monitoring requirement, additional monitoring "may be necessary" if the monitoring in the standard "does not provide the necessary assurance of compliance."[22] *E.g.*, GUIDANCE at 7–8. Petitioners describe that aspect of the Guidance this way: "The Guidance unequivocally directs state permitting authorities, as a minimum element of continued EPA program approval, to conduct wide-ranging sufficiency reviews and upgrade monitoring in nearly all individual permits or permit applications, even where the underlying applicable requirement incorporates 'periodic testing or in-

strumental or noninstrumental monitoring' in facial compliance with § 70.6(a)(3)(i)(B)." Reply Brief of Petitioners at 13.

EPA's view of the scope of the Guidance is about the same as petitioners'. But the agency thinks statements in the preamble to its 1992 rule and its responses to comments in the final rulemaking alerted interested onlookers to its current position and show that the Guidance issued in 1998 is no broader than the rule itself. EPA's strongest point is the following statement made in 1992: "To the extent commentators assert that Title V does not authorize EPA to require monitoring beyond that provided for in the applicable requirement, EPA disagrees with the commenters." EPA Response to Comments (hereinafter "RTC") at 6–3. On the face of it, this assertion of statutory authority may have reflected EPA's claim—which no one now disputes—that if an "applicable requirement" contained a one-time stack test, the federal agency could insist that the State authority insert in the permit a requirement that the test be performed at regular intervals. If that is all the EPA statement signified, it would be entirely consistent with petitioners' interpretation of the final rule.[23]

In its response to comments and in the preamble to the Title V regulations, EPA promised that if there is "any federally promulgated requirement with insufficient monitoring, EPA will issue a rulemaking to revise such requirement." 57 Fed.Reg. 32,278 (1992); RTC at 6–4.[24] The Guid-

---

**22.** By measuring the adequacy of monitoring in this manner, EPA's position introduces circularity. The Guidance instructs permitting authorities that monitoring is sufficient if it provides "a reasonable assurance of compliance with requirements applicable to the source." GUIDANCE at 7. But some of the applicable requirements are themselves methods for testing a source's compliance with other standards. For instance, in the case of a requirement to conduct an annual stack test, EPA's methodology suggests that performance of the one-time test would be sufficient as it provides "a reasonable assurance of compliance" with the applicable requirement. The problem is this gives permitting authorities no assistance in evaluating the proper frequency of such tests.

**23.** According to EPA's response to comments:

Examples of situations where Section 70.6(a)(3)(i)(B) would apply include a SIP provision which contains a reference test method but no testing obligation, or a NSPS which requires only a one time stack test on startup. Any Federal standards promulgated pursuant to the Act amendments of 1990 are presumed to contain sufficient monitoring and, therefore, only Section 70.6(a)(3)(i)(A) applies.

RTC at 6–4.

**24.** Later in its response to comments, EPA repeated this promise: "... EPA will revise federal regulations that need additional specification of test methods, including specifica-

ance, of course, charts a very different course. Now, it is initially up to the States to identify federal standards with deficient monitoring, doubtless with EPA's input, formal or informal. And it is the State and local agencies that must alter the standards by requiring permittees—such as petitioners—to comply with more stringent monitoring requirements. Needless to say, EPA's approach—delegating to State officials the authority to alter duly promulgated federal standards—raises serious issues, not the least of which is whether EPA possesses the authority it now purports to delegate. One would suppose, and EPA did in 1992, that if federal regulations proved inadequate for one reason or another, EPA would have to conduct a rulemaking to amend them. *See Clean Air Implementation Project v. EPA,* 150 F.3d 1200, 1203–04 (D.C.Cir. 1998).

EPA thinks two other statements in its response to comments alerted everyone that its new rule would set in motion an across-the-board review of the existing monitoring requirements contained in federal and State emission standards. The first of these statements is: "In many cases, the monitoring requirements in the underlying regulation will suffice for assessing compliance." RTC at 6–3. EPA treats the "in many cases" as a qualification. What does this tell the careful reader? Only that sometimes the State or federal emission standard will need to be supplemented. But the critical question is when—when the monitoring in the standard consists only of a one-time test? or when the yearly or monthly or weekly or daily testing specified in the standard is not enough, as determined by State authorities or EPA during the permit process?

The second statement is this:

The EPA reiterates that permits must be enforceable, and must include periodic monitoring, which might involve the use of, or be based on, appropriate reference test methods.... Where EPA

tion of frequency and degree of testing."

has not provided adequate guidance in regard to source testing or monitoring, permitting authorities are allowed to establish additional requirements, including requirements concerning the degree and frequency of source testing on a case-by-case basis, as necessary to assure compliance with Part 70 [Title V] permit terms or conditions. However, in no case may such frequency be less stringent than any frequency required by an underlying applicable requirement.

*Id.* at 6–5. If "periodic monitoring" means testing from time to time, the first sentence in this passage hardly advances EPA's current position. And the second sentence seems set against it. Only when "EPA has not provided adequate guidance in regard to source testing or monitoring," may State authorities provide additional monitoring. So what is "adequate guidance"? Once again the only concrete example EPA gave in 1992 was a one-time stack test, which rather makes petitioners' point.

The short of the matter is that the regulatory history EPA offers fails to demonstrate that § 70.6(a)(3)(i)(B) initially had the broad scope the Guidance now ascribes to it. Nothing on the face of the regulation or in EPA's commentary at the time said anything about giving State authorities a roving commission to pore over existing State and federal standards, to decide which are deficient, and to use the permit system to amend, supplement, alter or expand the extent and frequency of testing already provided. In fact, EPA's promise in the 1992 rulemaking—that if federal standards were found to be inadequate in terms of monitoring it would open rulemaking proceedings—is flatly against EPA's current position. (EPA makes no attempt to square this promise with the argument it makes today.)

Furthermore, we attach significance to EPA's recognition, in its 1992 permit regulations, that "Title V does not impose substantive new requirements," 40 C.F.R.

RTC at 6–5.

§ 70.1(b). Test methods and the frequency of testing for compliance with emission limitations are surely "substantive" requirements; they impose duties and obligations on those who are regulated. Federal testing requirements contained in emissions standards are promulgated after notice and comment rulemaking. Testing requirements in emission standards in State standards are presumably adopted by the State's legislature or administrative agency, and approved by EPA as part of the State's implementation plan. We have recognized before that changing the method of measuring compliance with an emission limitation can affect the stringency of the limitation itself. *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 396–97 (D.C.Cir.1973), *discussed in Clean Air Implementation Project v. EPA*, 150 F.3d at 1203. In addition, monitoring imposes costs. Petitioners represent that a single stack test can "cost tens of thousands of dollars, and take a day or more to complete," which is why "stack testing is limited to once or twice a year (at most)." Brief of Petitioners at 22 n.75. If a State agency, acting under EPA's direction in the Guidance, devised a permit condition increasing a company's stack test obligation (as set forth in a State or federal standard) from once a year to once a month, no one could seriously maintain that this was something other than a substantive change.[25]

There is still another problem with EPA's position. Although its Guidance goes to great lengths to explain what is meant by the words "periodic monitoring," it almost completely neglects a critical first step. On the face of § 70.6(a)(3)(i)(B), "periodic monitoring" is required if and only if "the applicable requirement does not require periodic testing or instrumental or noninstrumental monitoring (which may consist of record-keeping designed to serve as monitoring)." While the Guidance is quick to say that all Title V permits must contain "periodic monitoring," it never explains what constitutes "periodic testing" or what constitutes "instrumental or noninstrumental monitoring." Instead, throughout the Guidance, EPA either yokes these three items together, or treats the terms as synonymous, without saying why. Yet if "periodic testing" and "instrumental or noninstrumental monitoring" mean the same thing as "periodic monitoring," there is no accounting for why § 70.6(a)(3)(i)(B) was written as it was. The regulation could simply have said "periodic monitoring" is required for all permits, period.[26]

**25.** The Guidance, at p. 8, provides a six-point bullet point list for permit-writers, making clear that EPA expects them to engage in an intricate regulatory trade off (often on a unit-by-unit basis), assessing the costs and benefits of available technologies for the particular pollutant. This six-part list has mutated into a complex flow chart in the Draft Periodic Monitoring Technical Reference Document, and is reprinted as an Addendum to this opinion.

**26.** EPA argues that our opinion in *Natural Resources Defense Council, Inc. v. EPA*, 194 F.3d 130, 135–36 (D.C.Cir.1999), reflects an understanding of § 70.6(a)(3) "nearly identical" to that contained in the Guidance. Supplemental Brief of Respondent at 4. The opinion stated:

> [T]he 1990 Clean Air Act Amendments did not mandate that EPA fit all enhanced monitoring under one rule and EPA has reasonably illustrated how its enhanced monitoring program, when considered in

its entirety, complies with § 114(a)(3). Specifically, EPA demonstrated that many of the major stationary sources exempt from CAM are subject to other specific rules, and if they are not, they are subject to the two residual rules: (1) "[The permit shall contain] periodic monitoring sufficient to yield reliable data ... that are representative of the source's compliance with the permit...." 40 C.F.R. § 70.6(a)(3)(i)(B); (2) "All part 70 permits shall contain the following elements with respect to compliance: (1) Consistent with paragraph (a)(3) of this section, compliance certification, testing, [and] monitoring ... requirements sufficient to assure compliance with the terms and conditions of the permit." *Id.* § 70.6(c)(1).

*Id.* The bracketed portion of the quotation reads out of subsection (B) the conditions that "periodic monitoring" is required only when "the applicable requirement does not require periodic testing or instrumental or noninstrumental monitoring (which may con-

In sum, we are convinced that elements of the Guidance—those elements petitioners challenge—significantly broadened the 1992 rule. The more expansive reading of the rule, unveiled in the Guidance, cannot stand. In directing State permitting authorities to conduct wide-ranging sufficiency reviews and to enhance the monitoring required in individual permits beyond that contained in State or federal emission standards even when those standards demand some sort of periodic testing, EPA has in effect amended § 70.6(a)(3)(i)(B). This it cannot legally do without complying with the rulemaking procedures required by 42 U.S.C. § 7607(d).[27] *See Alaska Professional Hunters Ass'n v. FAA,* 177 F.3d 1030, 1034 (D.C.Cir.1999); *Caruso v. Blockbuster–Sony Music Entertainment Centre,* 174 F.3d 166, 176–78 (3d Cir.1999); *Paralyzed Veterans,* 117 F.3d at 585–86.

■ For the reasons stated, we find setting aside EPA's Guidance to be the appropriate remedy. Though petitioners challenge only portions of the Guidance, partial affirmance is not an option when, as here,"there is 'substantial doubt' that the agency would have adopted the severed portion on its own." *Davis County Solid Waste Management v. EPA,* 108 F.3d 1454, 1458 (D.C.Cir.1997) (quoting *North Carolina v. FERC,* 730 F.2d 790, 795–96 (D.C.Cir.1984)). In view of the intertwined nature of the challenged and unchallenged portions of the Guidance, the Guidance must be set aside in its entirety. *See* 42 U.S.C. § 7607. State permitting authorities therefore may not, on the basis of EPA's Guidance or 40 C.F.R. § 70.6(a)(3)(i)(B), require in permits that the regulated source conduct more frequent monitoring of its emissions than that provided in the applicable State or federal standard, unless that standard requires no periodic testing, specifies no frequency, or requires only a one-time test.

*So ordered.*

sist of record-keeping designed to serve as monitoring)." When that clause is reinserted, it becomes clear that the quotation does not speak to the situation of permits which already provide for periodic testing, addressed in 40 C.F.R. § 70.6(a)(3)(i)(A).

**27.** Unless EPA certifies that the amendments to the Title V rule would not "have a significant economic impact on a substantial number of small entities," 5 U.S.C. § 605(b), it must also comply with the various procedural requirements of the Small Business Regulatory Enforcement Fairness Act, 5 U.S.C. §§ 601–612.

# Addendum

PERIODIC MONITORING TECHNICAL REFERENCE DOCUMENT
EVALUATION PROCESS TO DETERMINE APPROPRIATE PERIODIC MONITORING