# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 8, 2008        Decided March 20, 2009

No. 07-1151

NATURAL RESOURCES DEFENSE COUNCIL,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN FARM BUREAU FEDERATION, ET AL.,
INTERVENORS

---

Consolidated with 08-1057

---

On Petitions for Review of Final Actions
of the Environmental Protection Agency

---

*Colin C. O'Brien* argued the cause for petitioner. With him on the briefs was *John Walke*.

*Joshua M. Levin*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *John C. Cruden*, Deputy Assistant Attorney General.

*Peter S. Glaser* argued the cause for intervenor. With him

on the brief were *Norman W. Fichthorn*, *Julie Anna Potts*, and *Harold P. Quinn Jr. Richard E. Schwartz* entered an appearance.

Before: HENDERSON, RANDOLPH and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* ROGERS**.**

RANDOLPH, *Circuit Judge*: State authorities submit air pollution emissions data to the Environmental Protection Agency. EPA monitors the data in order to evaluate regional compliance with national air pollution standards. In 2007, EPA promulgated a regulation governing the exclusion of emissions data during "exceptional events" such as natural disasters. The Natural Resources Defense Council (NRDC) brought petitions for review, seeking to set aside the rule's definition of "natural events" and to vacate several statements in the preamble to the rule concerning types of events that may qualify as "exceptional."

I.

The Clean Air Act commands EPA to promulgate national air quality standards for certain air pollutants. States develop and implement plans to comply with EPA's air quality standards. 42 U.S.C. §§ 7408–7410. The states have established a network of air quality monitoring stations to measure regional compliance with EPA's national standards. Based on this data, EPA designates areas as being in either "attainment" or "nonattainment" and imposes more rigorous

pollution control measures in "nonattainment" areas. *See* 42 U.S.C. §§ 7407(d), 7502.

In 2005, Congress amended the Clean Air Act to require EPA to promulgate regulations governing air quality monitoring during "exceptional events." *See* 42 U.S.C. § 7619(b). The amended statute defined "exceptional event" as an event that "(i) affects air quality; (ii) is not reasonably controllable or preventable; (iii) is an event caused by human activity that is unlikely to recur at a particular location or a natural event; and (iv) is determined by the Administrator . . . to be an exceptional event." *Id.* § 7619(b)(1)(A). EPA published a final exceptional events rule, accompanied by a lengthy preamble, in March 2007. Treatment of Data Influenced by Exceptional Events, 72 Fed. Reg. 13,560 (Mar. 22, 2007) (codified at 40 C.F.R. §§ 50.1, 50.14, 51.930). The final rule's definition of "exceptional events," codified at 40 C.F.R. § 50.1(j), repeated the statutory language. In the next subsection, the rule defined "natural event" – as used in 42 U.S.C. § 7619(b)(1)(A)(iii) – as "an event in which human activity plays little or no direct causal role." 40 C.F.R. § 50.1(k). The rule also provided that states may "flag" anomalous data caused by exceptional events, and that EPA will then review the flagged data and determine whether to exclude it from the set of data used in reviewing compliance with its air quality standards. 40 C.F.R. § 50.14.

NRDC argues against EPA's definition of "natural event," against its description in the rule's preamble of a "final rule concerning high wind events," and against its list, again in the preamble, of examples of potentially exceptional events.

II.

NRDC's complaint is that EPA should not have defined "natural event" in 40 C.F.R. § 50.1(k) to include events in which

human activities play "little" causal role. As NRDC sees it, a "natural event" within the meaning of § 7619 is something that occurs without the slightest human influence. EPA says this objection was never raised during the rulemaking and is therefore barred.

Section 307 of the Clean Air Act states: "Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review." 42 U.S.C. § 7607(d)(7)(B). Similar provisions are common with respect to other agencies. *See Wash. Ass'n for Television & Children v. FCC*, 712 F.2d 677, 682 n.6 (D.C. Cir. 1983). Their purpose is to ensure that the agency and other interested persons have been alerted to the commenter's objection to the proposed rule. The agency then may correct or modify the rule it proposed or explain why it disagrees with the objection. *See Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998). Other parties also may contribute to the agency's deliberations by endorsing or opposing the objection and by providing information and arguments in support of their position.

NRDC thinks the following portion of its nine-page, single spaced letter to EPA constituted an objection to EPA's proposed definition of "natural event":

> Under no circumstance can the clean-up associated with a natural disaster itself be considered a "natural event." EPA's suggestion to the contrary flies in the face of the plain statutory language. The statute clearly and explicitly distinguishes between "natural event[s]" (events that do not have a human origin) and "events caused by human activity." A natural event is one that is not the result of human activity . . . While the

level of human activity that discharges pollutants may increase in the wake of a natural disaster, emissions from clean-up activities (such as debris burning, operation of diesel equipment, and demolition activities) are clearly events caused by human activity, and may not be classified as "exceptional events" unless they meet each of the requirements of section 319 for qualifying anthropogenic events.

In short, the activities themselves that are responsible for the emissions (and possible violations of the NAAQS) are of human origin, and by definition *not* natural events. The fact that a natural event precipitates the need for human activity cannot and does not transform the human activity itself into a natural event. Thus, the Act clearly precludes EPA from identifying emissions from clean-up activities as "natural events" that qualify as exceptional events.

NRDC Comments, at 4–5.

Given the context, no EPA official would have guessed that NRDC was complaining about the agency's proposed definition of "natural event." Those familiar with the proceedings would have taken NRDC's remarks as a criticism of the one sentence in the notice of proposed rulemaking dealing with clean-up activities after a natural disaster (such as the eruption of Mt. St. Helens in 1980 or Hurricane Katrina in 2005). The sentence read: "For the purpose of flagging, major natural disasters, such as hurricanes and tornadoes for which State, local, or Federal relief has been granted, and clean-up activities associated with these events may be considered exceptional events." Treatment of Data Influenced by Exceptional Events, 71 Fed. Reg. 12,592, 12,596 (Mar. 10, 2006). It is not apparent that EPA even rested its view about clean-up activities on the proposed definition of

"natural event" in 40 C.F.R. § 50.1(k) rather than on the clause in another proposed subsection defining "exceptional events" to include human activities "unlikely to recur at a particular location," *id.* § 50.1(j).

There are additional reasons why NRDC's critique, quoted above, would not have alerted the careful reader to the complaint it now makes about § 50.1(k). NRDC's comments said that a natural event could not have a "human origin" and could not be "the result of human activity." These comments are not necessarily inconsistent with § 50.1(k)'s definition of natural events as ones in which human activity plays "little or no direct causal role." No one would say that the "origin" of the tornado was human activity because the storm spread man-made air pollutants throughout the countryside. The definition of "natural event" in proposed § 50.1(k) was only a few words long, yet NRDC did not quote the portion it now finds objectionable. NRDC never even identified the rule by section number or placement in the notice of proposed rulemaking. We have held that Section 307 of the Clean Air Act bars litigants from arguing against a particular section of a rule on judicial review if they failed to identify the particular section in their comments during the rulemaking. *See Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1240 (D.C. Cir. 2004); *Motor & Equip. Mfrs.*, 142 F.3d at 462. A citation to the section of the rule or a description of it may be all that is needed. If a comment lacking even that low level of specificity sufficed, the agency would be subjected to verbal traps. Whenever the agency failed to detect an obscure criticism of one aspect of its proposal, the petitioner could claim not only that it had complied with Section 307 but also that the agency acted arbitrarily because it never responded to the comment. Rulemaking proceedings and the legal doctrines that have grown up around them are intricate and cumbersome enough. Agency officials should not have to wade through reams of documents searching

for "'implied' challenges." *Mossville*, 370 F.3d at 1239. It is not too much to expect interested persons to point to the particular portion of the proposed rule they are arguing against.

It is worth adding that after EPA promulgated the final rule containing § 50.1(k) and its definition of "natural event," NRDC filed a petition for reconsideration. In its petition NRDC spelled out for the first time its complaint about not excluding from "natural event" those events in which human activity had only a "little" causal effect. NRDC also explained that the grounds for its objection to § 50.1(k) "arose after the period for public comment and are of central relevance to the rule." Petition for Reconsideration, In the Matter of the Final Rule: Treatment of Data Influence by Exceptional Events, No. 2060-AN40 (E.P.A. May 21, 2007). This representation cuts against NRDC's current position that it objected to § 50.1(k) during the comment period and is a further indication that NRDC failed to satisfy Section 307's requirement.

III.

The balance of NRDC's case deals not with the rules EPA promulgated but with its statements in the preamble to the rules. We have jurisdiction to review these statements only if they constitute final agency action. 42 U.S.C. § 7607(b)(1). A final agency action is one that marks the consummation of the agency's decisionmaking process and that establishes rights and obligations or creates binding legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). While preamble statements may in some unique cases constitute binding, final agency action susceptible to judicial review, *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1222–23 (D.C. Cir. 1996), this is not the norm. Agency statements "having general applicability and legal effect" are to be published in the Code of Federal Regulations. Federal Register Act, 44 U.S.C.

§ 1510(a)–(b); 1 C.F.R. § 8.1; *see Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986).

In one section of the preamble, EPA refers to its "final rule concerning high wind events," which "states that ambient particulate matter concentrations due to dust being raised by unusually high winds will be treated as due to uncontrollable natural events" when certain conditions apply. 72 Fed. Reg. 13,560, 13,576. There is no such final rule. The final rule does not mention high wind events or anything about "ambient particulate matter concentrations." EPA calls this a drafting error. In light of the error, the high wind events section of the preamble is a legal nullity. Agencies must publish substantive rules in the Federal Register to give them effect. 5 U.S.C. § 552(a)(1); *Morton v. Ruiz*, 415 U.S. 199, 233 & n.27 (1974). An unpublished final rule on high winds can have no legal consequences, and neither can preamble statements mentioning such a rule. *See Brock*, 796 F.2d at 539. Because there was no "nationally applicable . . . final action taken" by EPA, 42 U.S.C. § 7607(b)(1), there is nothing for this court to review.

The preamble also contains a list of "examples" of events that may be considered "exceptional" under the final rule. *See* 72 Fed. Reg. 13,560, 13,564–65. NRDC objects to these examples on the basis that they treat a variety of common events as per se exceptional in violation of 42 U.S.C. § 7619. We do not believe the statements in the preamble amounted to final agency action. EPA spoke in the conditional, suggesting that events in the various categories "may be exceptional events" or "may qualify for exclusion under this rule provided that all other requirements of the rule are met." 72 Fed. Reg. at 13,564–65. Other statements were equivocal, such as the declaration, repeated several times in different forms, that certain events are to be evaluated "on a case-to-case basis." *Id.* Giving "decisive weight to the agency's choice between 'may' and 'will,'" *Brock*,

796 F.2d at 538, we have held that similar statements are nonbinding and unreviewable. *See Interstate Natural Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 60 (D.C. Cir. 2002); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

Even if the statements in the preamble were reviewable under the Clean Air Act, they are not ripe for review at this time. The statements about exceptional events are "hypothetical and non-specific." *Kennecott*, 88 F.3d at 1223. NRDC has not demonstrated that any of the statements has immediate legal or practical consequences. How EPA will use or rely on or interpret what it said in the preamble is uncertain. *See Kennecott*, 88 F.3d at 1223; *Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n*, 940 F.2d 679, 683 (D.C. Cir. 1991). We can see no significant hardship to the parties from waiting for a real case to emerge. As EPA points out in its brief, the Clean Air Act "provides for judicial review of any EPA decision to determine the attainment status of an area, or to designate or redesignate an area, based on EPA's decision to exclude exceptional events data or other information." Resp'ts Br. at 39; *cf. Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998).

The petitions for review are therefore dismissed.

*So ordered.*

ROGERS, *Circuit Judge*, concurring in part and dissenting in part: When an agency receives comments that object to its application of a statutory term as being contrary to the plain text of the statute, what is the agency to understand is the target of the objection? The specific application or the agency's underlying interpretation of the term or both? The court responds only the application. But the answer depends on how the comments are phrased. If, as here, the comments address a specific application by pointing out that it reflects an interpretation of a statutory term that contradicts the plain text of the statute, how can the agency respond to the comments without considering whether its definition is consistent with the statute, much less how would it not be on notice that the comments extended to the agency's interpretation of the statutory term?

The NRDC objected to EPA's interpretation of the term "natural event," 42 U.S.C. § 7619(b)(1)(A)(iii),[1] as applied to emissions arising from clean-up activities associated with natural disasters, explaining that such an interpretation was inconsistent with the statutory text and the legislative history. It offered these comments in the context of addressing EPA's list of examples of "natural events" in the preamble to the notice of proposed rulemaking, The Treatment of Data Influenced by

---

[1] The Clean Air Act defines "exceptional event" as an event that —

> (i) affects air quality;
> (ii) is not reasonably controllable or preventable;
> (iii) is an event caused by human activity that is unlikely to recur at a particular location *or* a *natural event*; and
> (iv) is determined by the Administrator through the process established in the regulations promulgated under paragraph (2) to be an exceptional event.

42 U.S.C. § 7619(b)(1)(A) (emphasis added).

Exceptional Events ("NPRM"), 71 Fed. Reg. 12,592, 12,596 (Mar. 10, 2006). NRDC Comments, at 4-5. Given the stated reason for the objection to the application and the context, it is unclear what rule follows from the court's approach for there is no heightened comment requirement under the Administrative Procedure Act, the Clean Air Act, or our precedent.

Although section 307's exhaustion requirement is "strictly" enforced, *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998), our precedent explains that "commenters must be given some leeway in developing their argument before this court, so long as the comments to the agency were adequate notification of the general substance of the complaint." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 891 (D.C. Cir. 2006). Likewise, our precedent rejects the idea that the exhaustion requirement calls for hair-splitting. *E.g.*, *Appalachian Power Co. v. EPA*, 135 F.3d 791, 817 (D.C. Cir. 1998). For example, in *National Petrochemical & Refiners Association v. EPA*, 287 F.3d 1130 (D.C. Cir. 2002), the court concluded that although the comments did not specifically mention the cold-start portion of the Federal Test Procedure, they did "raise the underlying issue of poor performance at certain temperatures," *id.* at 1139, and consequently the comments were "close enough to have put the EPA on notice that it had to defend the performance of the $NO_x$ adsorbers at all relevant temperatures and conditions," *id.* at 1139-40. So too here, where the comments and the structure of the NPRM both indicate that EPA was put on notice of NRDC's underlying objection to the definition of "natural event."

The comments at issue stated:

> [1] Under no circumstances can the clean-up associated with a natural disaster itself be considered a "natural event." [2] EPA's suggestion to the contrary

flies in the face of the plain statutory language. [3] The statute clearly and explicitly distinguishes between "natural event[s]" (events that do have a human origin) and "events caused by human activity." [4] A natural event is one that is not the result of human activity. [5] For example, the Legislative History identifies *only* forest fires and volcanic eruptions as examples of natural events. [6] While the level of human activity that discharges pollutants may increase in the wake of a natural disaster, emissions from clean-up activities (such as debris burning, operation of diesel equipment, and demolition activities) are clearly events caused by human activity, and may not be classified as "exceptional events" unless they meet each of the requirements of section 319 for qualifying anthropogenic events.

[7] In short, the activities themselves that are responsible for the emissions (and possible violations of NAAQS) are of human origin, and by definition *not* natural events. [8] The fact that a natural event precipitates the need for human activity cannot and does not transform the human activity itself into a natural event. [9] Thus, the Act clearly precludes EPA from identifying emissions from clean-up activities as "natural events" that qualify as exceptional events.

NRDC Comments, at 4-5 (internal citation omitted) (alteration other than numbering in NRDC comments).

It is readily apparent these comments put EPA on notice that the NRDC was objecting to its broad interpretation of the statutory term "natural event." Although the comments do not expressly refer to 40 C.F.R. § 50.1(k), which codifies EPA's definition of "natural event," the introductory phrase — "[u]nder

4

no circumstances" — signals an underlying concern with EPA's interpretation of what can qualify as a "natural event." So introduced, the second sentence makes clear that the preceding reference to a particular application is grounded in an objection to the agency's interpretation of what is a "natural event" as too broad and contrary to the plain statutory text. The third sentence explains why, pointing to the distinction in the statute between natural events and those caused by human activity. *See* 42 U.S.C. § 7619(b)(1)(A)(iii). The fourth sentence states the conclusion that follows in the commenter's view. Support for that view is offered in the fifth sentence's reference to an illustrative example in the legislative history. The sixth sentence identifies the confusion that the agency's broad interpretation reflects, given the statutory distinction and inclusion of specific exceptions. The second paragraph makes the same point: the statute bars EPA from including such an application in its listing of examples of a "natural event" because clean-up activities and other events resulting from human activity are inherently (as opposed to impliedly) human activities and thus not a "natural event."

Even if the entirety of the above-quoted comments did not put EPA on notice that the NRDC was objecting to its interpretation of "natural event," the fourth sentence did. Following a sentence noting the statutory distinction, the fourth sentence states: "A natural event is one that is not the result of human activity." [3-5] This alone was fair warning that, according to the NRDC, the statute precludes treating any human-caused activity as a "natural event." As the fourth sentence was made in the context of addressing EPA's application of its definition, the comments were "close enough," *Nat'l Petrochem. & Refiners Ass'n*, 135 F.3d at 817, to have put EPA on notice that the commenter was challenging the agency's definition of a statutory term. Either way EPA could not avoid being aware that the NRDC's comments objected to the

underlying broad interpretation of "natural event" and so met the Clean Air Act's "reasonable specificity" requirement, 42 U.S.C. § 7607(d)(7)(B).

This is not an instance in which the agency would be unclear as to what the comments addressed or have to "wade through reams of documents searching for 'implied challenges,'" Op. at 6-7 (quoting *Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1240 (D.C. Cir. 2004)). The comments state on the first page that they are addressing "elements of EPA's March 10 proposal," i.e., the NPRM, and explain why, as demonstrated by one example in the preamble's listing of examples, EPA's interpretation of "natural event" could not be consistent with the plain meaning of the statute, *see* Op. at 6, pointing to the statutory text and the legislative history, [3]-[5]. Even speculating — contrary to EPA's proposal, *see* NPRM, 71 Fed. Reg. at 12,596 — that EPA's view of clean-up activities was based on the definition of "exceptional events" as including human activities "unlikely to recur at a particular location," *see* Op. at 5-6, the comments would alert EPA to the objection that the statute does not permit an activity with any human cause to be an "exceptional event" unless the statutory criteria for an "event caused by human activity" were satisfied, [6]. In fact, by using separate sections and headings in the comments to address each possibility, NRDC's comments object to the proposed rule's treatment of clean-up activities as "exceptional events" either as natural events or events caused by human activity.

The specified context of the comments, especially the placement of the clean-up-activities example in that part of the NPRM where EPA was giving examples of how its definition of "natural event" would be applied also shows that EPA was on notice of the objection to its interpretation of "natural event." The comments address a sentence in the NPRM involving clean-up activities after a natural disaster, *see* Op. at 5, that

appears in the section of the preamble to the proposed rule giving examples of "natural events." NPRM, 71 Fed. Reg. at 12,596 ("5. Natural Events"). The comments thereby direct the reader to the underlying concept that is at issue: a broad interpretation of "natural event" that includes activities with some human contribution. Together, the text and structure of the comments and placement of the clean-up activities example in the NPRM's listing sufficed to put EPA on notice that the NRDC was objecting to EPA's definition of "natural event." Nothing in the NRDC's petition for reconsideration suggests its earlier comments had not raised an objection to the agency's interpretation of "natural event." *See* Op. at 7. In the petition the NRDC complains only that earlier comments could not have objected to justifications for the definition that appeared for the first time in the preamble to the final rule, namely certain legislative history, a previous rulemaking proposal, and new illustrative examples. In any event, the rehearing objection to EPA's definition of "natural event" tracks the NRDC's earlier comments.[2]

Nonetheless, although EPA was on notice that the NRDC

_____

[2] In seeking reconsideration of the final rule, NRDC stated:

The Final Rule's interpretation of the statutory term "natural event" is an unlawful departure from the clear language of the statute. The statute identifies a dichotomy whereby events are either "natural" or "caused by human activity". 42 U.S.C. § 7619(1)(A). Since the statute (and logic) does not permit an event to be both natural and caused by human activity, a 'natural event" has no human activity.

Petition for Reconsideration of the Natural Resources Defense Council, In the Matter of the Final Rule: Treatment of Data Influenced by Exceptional Events, No. 2060-AN40, at 5-6 (E.P.A. May 21, 2007).

was objecting to its broad interpretation of "natural event" in a manner that would include human activities, the NRDC's objection fails on the merits. The Clean Air Act does not define "natural event" or specify how to categorize events with predominantly natural causes but some human contribution. Because the statute leaves a gap to be filled by EPA, the statutory term is ambiguous. EPA's definition, in turn, is permissible. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984). As EPA offers, "human activities sometimes contribute to otherwise spontaneous events," Respondent's Br. at 33; *see also* Treatment of Data Influenced by Exceptional Events ("Final Rule"), 72 Fed. Reg. 13,560, 13,563 (Mar. 22, 2007), such as a planned forest fire that gets out of control because of unforeseen circumstances. Still, the question whether EPA's application of the term "natural event" to particular circumstances will, in fact, be permissible is for another day, as EPA's listing of examples is neither exhaustive, *see* Final Rule, 72 Fed. Reg. at 13,564, nor binding on it, *see* Op. at 8-9; *cf. Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 226-28 (D.C. Cir. 2007); *Interstate Natural Gas Ass'n of America v. FERC*, 285 F.3d 18, 60 (D.C. Cir. 2002).

Accordingly, I respectfully dissent from Part II of the opinion and otherwise concur.