Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 6, 2002          Decided February 28, 2003

No. 01-1204

UTILITY AIR REGULATORY GROUP,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

CLEAN AIR IMPLEMENTATION PROJECT,
INTERVENOR

On Petition for Review

*Lauren E. Freeman* argued the cause for the petitioner. *Mel S. Schulze* was on brief.

*Christopher S. Vaden*, Attorney, United States Department of Justice, argued the cause for the respondent. *Gregory B. Foote* and *Kerry E. Rodgers*, Attorneys, United States Envi-

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

ronmental Protection Agency, were on brief. *Kent E. Hanson*, Attorney, United States Department of Justice, entered an appearance.

*William H. Lewis, Jr.*, and *Michael A. McCord* were on brief for the intervenor.

Before: EDWARDS, HENDERSON, and ROGERS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The petitioner, the Utility Air Regulatory Group (UARG), a trade association whose members include *inter alia* individual electric utilities, seeks review and vacatur of the interpretation given by the Environmental Protection Agency (EPA or Agency) to its *State Operating Permit Program* regulations, 40 C.F.R. § 70.6(c)(1), and *Federal Operating Permit Program* regulations, 40 C.F.R. § 71.6(c)(1). According to the EPA, the regulations authorize, pursuant to Title V of the Clean Air Act (CAA), 42 U.S.C. §§ 7661 *et seq.*, permit issuing authorities to enhance the conditions included in operating permits issued to facilities that release air pollutants, *viz.* by imposing emission monitoring requirements on a case-by-case basis to "assure compliance" with federal emission standards. 42 U.S.C. § 7661c(a); 40 C.F.R. §§ 70.6(c)(1), 71.6(c)(1). UARG asserts that the EPA's interpretation—which it says is manifested in at least two permit-specific orders as well as an Agency permit instruction manual—effectively, and without required notice and comment, amends operating permit rules the EPA promulgated in 1992 and 1996. Alternatively, UARG asserts, the Agency's interpretation of 40 C.F.R. §§ 70.6(c)(1) and 71.6(c)(1) is unauthorized under the CAA. For the following reasons, we dismiss the petition because UARG lacks standing. In any event, the issue raised by UARG is not ripe for judicial review.

## I.

UARG's petition for review is one of various industry groups' challenges to the EPA's implementation of the 1990 amendments to Title V of the Clean Air Act. *See, e.g.*,

*Appalachian Power v. EPA*, 208 F.3d 1015, 1019 (D.C. Cir. 2000); *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998). Title V of the CAA and its implementing regulations govern the operating permit issuing process for stationary sources of air pollution. 42 U.S.C. §§ 7661 *et seq.*; 40 C.F.R. parts 70, 71.[1] Under Title V, a regulated source of air pollution cannot operate without obtaining an operating permit from the appropriate state or local authority that administers an EPA-approved implementation plan (or from the EPA if no EPA-approved plan exists). 42 U.S.C. § 7661a(a). Although the state or local authority may approve a new permit or a permit submitted for modification or renewal, it must first submit the permit to the EPA for its review. *Id.* § 7661d. The EPA may "object to [the] issuance" of the permit within 45 days; if it does object, "the permitting authority may not issue the permit" unless the permit is "revised to meet the objection." *Id.* § 7661d(b)(3), (c).

Parts 70 and 71 of the EPA's "Air Programs" regulations establish the "minimum elements" of a Title V permit program, including provisions specifying the contents of each permit. 40 C.F.R. §§ 70.6, 71.6. Under the EPA's rules, each permit must specify the permit's duration, the emission limitations and standards applicable to the source of air pollution, monitoring and "measures to assure compliance" (including record keeping and reporting) with the conditions and terms of the permit. 40 C.F.R. §§ 70.6(a)(1)–(3), (c), 71.6(a)(1)–(3), (c).

Because emission standards and monitoring requirements differ depending on the particular source of air pollution, the terms and conditions of each permit also vary. For some

---

[1] Part 70 applies to state-implemented Title V permit programs and Part 71 applies to Title V programs administered by the EPA where an EPA-approved state program is not in place. Although the regulations at issue here, 40 C.F.R. §§ 70.6(c)(1), 71.6(c)(1), were promulgated at different times, Part 70 in 1992 and Part 71 in 1996, the relevant text of each is identical and therefore we treat them the same.

sources, in addition to restricting the amount of emitted pollutants, the permit imposes periodic monitoring, testing and recordkeeping requirements.[2]  The monitoring and testing requirements ensure that sources continuously comply with emission standards.  For other sources no EPA or state-approved standard imposes periodic monitoring or testing; instead, the EPA regulation requires the state or other permit authority to add monitoring and testing conditions sufficient to monitor compliance with the permit.  40 C.F.R. § 70.6(a)(3)(i)(B); *see Appalachian Power*, 208 F.3d at 1019 (explaining that section 70.6(a)(3)(i)(B) requires periodic monitoring if no periodic monitoring requirement exists).

Before the EPA employed the interpretation under challenge, it had read 40 C.F.R. § 70.6(a)(3)(i)(B)[3] to authorize the inclusion of supplemental monitoring and testing conditions in a permit even if an EPA or state-approved periodic monitoring or testing requirement was already in place.  In 1998 the EPA issued a document entitled *Periodic Monitor-*

---

[2] For example, for a source that engages in lead smelting, the standards limit the total amount of stack emissions, 40 C.F.R. § 63.1543(a), and require the source to monitor daily the "baghouse cell" pressure, inspect weekly to ensure that dust is removed from hoppers and perform quarterly inspections of certain equipment, 40 C.F.R. § 63.1547.

[3] Section 70.6(a)(3)(i)(B) provides that a permit must contain:

Where the applicable requirement does not require periodic testing or instrumental or noninstrumental monitoring (which may consist of recordkeeping designed to serve as monitoring), periodic monitoring sufficient to yield reliable data from the relevant time period that are representative of the source's compliance with the permit, as reported pursuant to paragraph (a)(3)(iii) of this section. Such monitoring requirements shall assure use of terms, test methods, units, averaging periods, and other statistical conventions consistent with the applicable requirement.  Recordkeeping provisions may be sufficient to meet the requirements of this paragraph (a)(3)(i)(B) of this section[.]

40 C.F.R. § 70.6(a)(3)(i)(B).

*ing Guidance for Title V Operating Permits Programs* (Guidance), which interpreted 40 C.F.R. § 70.6(a)(3)(i)(B) to require a permit issuer, if existing requirements failed to "yield reliable data from the relevant time period that are representative of the source's compliance," to impose stricter monitoring and testing conditions. *Appalachian Power*, 208 F.3d at 1019–20 (describing EPA's view of 40 C.F.R. § 70.6(a)(3)(i)(B) articulated in Guidance). In *Appalachian Power*, however, electric utilities as well as associations representing the chemical and petroleum industries successfully challenged the EPA's interpretation as an impermissible broadening of the EPA's regulation. *Id.* at 1028. We concluded the Guidance effectively, and invalidly, amended 40 C.F.R. § 70.6(a)(3)(i)(B) without complying with the rulemaking requirements of the CAA, 42 U.S.C. § 7607(d). *Id.*

Since *Appalachian Power*, in two permit-related adjudications and in the promulgation of its *Instruction Manual for Permit Application Forms*, the EPA has used a "separate 'sufficiency' requirement" imposed by other regulations (sections 70.6(c)(1) and 71.6(c)(1)) to reach the same interpretation this court rejected in *Appalachian Power*. *PacifiCorp's Jim Bridger and Naughton Electric Utility Steam Generating Plants*, Petition No. VIII–00–1 at 18, *at* http://www.epa.gov/region07/programs/artd/air/title5/t5memos /woc020.pdf (Nov. 18, 2000) (order denying in part and granting in part petition challenging state operating permit) (*PacifiCorp* Order), Joint Appendix (JA) at 288; *see Fort James Camas Mill*, Petition No. X–1999–1, at 7 (Dec. 22, 2000) (order denying in part and granting in part petition to object to state operating permit) (*Fort James Camas Mill* Order), JA 29; *Instruction Manual for Permit Application Forms* at 23 (Jan. 2001) (Manual), JA 36. According to the petitioner, the EPA now interprets section 70.6(c)(1) (as well as section 71.6(c)(1)) to mandate, "[w]here the applicable requirement already requires periodic testing or instrumental or non-instrumental monitoring," that a permit issuer conduct "sufficiency reviews of periodic testing and monitoring in applicable requirements, and enhancement of that testing or monitoring through the permit as necessary to be suffi-

cient to assure compliance with the terms and conditions of the permit." *PacifiCorp* Order at 18–19.[4] For example, in *PacifiCorp*, where a quarterly monitoring requirement was required by existing standards, the EPA determined the quarterly monitoring to be too "infrequent" to " 'assure compliance,' " and, using section 70.6(c)(1), conditioned issuance of the permit on additional monitoring. *PacifiCorp* Order at 19.[5]

UARG challenges the EPA's interpretation of sections 70.6(c)(1) and 71.6(c)(1), maintaining that it resurrects the interpretation we rejected in *Appalachian Power*; that is, it results in the same impermissible broadening of the rule. UARG points out that the regulatory history, the same history applicable to section 70.6(a)(3)(i)(B), does not indicate that section 70.6(c)(1) was meant to impose a separate regulatory standard requiring a permit issuer to conduct sufficiency reviews. *See also Appalachian Power*, 208 F.3d at 1026–27

---

[4] Sections 70.6(c)(1) and 71.6(c)(1) both state:

(c) *Compliance requirements*. All part [70 or 71] permits shall contain the following elements with respect to compliance:

(1) Consistent with paragraph (a)(3) of this section, compliance certification, testing, monitoring, reporting, and recordkeeping requirements sufficient to assure compliance with the terms and conditions of the permit. Any document (including reports) required by a part [70 or 71] permit shall contain a certification by a responsible official that meets the requirements of § [70.5(d) or 71.5(d)] for [sic] this part.

40 C.F.R. §§ 70.6(c)(1), 71.6(c)(1).

[5] In the *Fort James Camas Mill* Order the EPA, explaining that "the separate regulatory standard at section 70.6(c)(1) applies" where periodic testing or monitoring exists, decided that two permit conditions failed to provide sufficient monitoring. *Fort James Camas Mill* Order at 7–9, JA 29–31. The Manual likewise directs Part 71 permit approval authorities to apply the same interpretation, requiring authorities to "enhance … testing or monitoring" where the applicable requirement is not "sufficient to assure compliance with the terms and conditions of the permit." Manual at 23, JA 36.

("The short of the matter is that the regulatory history EPA offers fails to demonstrate that § 70.6(a)(3)(i)(B) initially had the broad scope the Guidance now ascribes to it."). Alternatively, UARG argues that the EPA's interpretation results in a regulation unauthorized by the CAA.

## II.

"[B]efore we reach the merits of any claim, we must first assure ourselves that the dispute lies within the constitutional and prudential boundaries of our jurisdiction." *La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1382 (D.C. Cir. 1996). A court must confine itself "to adjudicating 'actual cases' and 'controversies,'" *Allen v. Wright*, 468 U.S. 737, 750 (1984), and in the administrative context, should avoid "premature adjudication . . . until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). For UARG, this means that UARG has standing to challenge the EPA's interpretation, and, if so, that the controversy is ripe for us to review. Because UARG petitions on behalf of its members, it has standing only if "at least one of its members would have standing to sue in his own right," *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 342–43 (1977)). As an "irreducible constitutional minimum," then, it must meet the Article III requirements for standing; it must have suffered "a concrete and particularized injury that [was]: (1) actual or imminent, (2) caused by, or fairly traceable to an act that [it] challenges in the instant litigation, and (3) redressable by the court." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (internal quotation marks and citations omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

While UARG identifies several instances in which the EPA has applied the "interpretation" it seeks to have overturned, it does not specify how any particular action(s) has injured it

or its members.[6] Of the three Agency actions UARG discusses in its brief,[7] we need consider only whether the EPA's issuance of the Manual has caused it injury because it expressly disavows any challenge of the two permit proceedings. Brief for Petitioner at 30; Reply Brief for Petitioner at 9.[8] UARG's petition, however, fails to allege any "concrete and particularized" injury that is "actual or imminent[ ] [and] not conjectural or hypothetical" based on the EPA's interpretation contained in its Manual. *Panhandle E. Pipeline Co. v. FERC*, 198 F.3d 266, 268 (D.C. Cir. 1999). UARG does not assert that the interpretation in the Manual has affected any Title V permit of any UARG member or the Title V permitting process. Although UARG contends that the EPA's interpretation has caused "permitting authorities to continue to be under pressure to issue final Title V permits consistent with EPA's new statement of the law," Brief for Petitioner at 23, it has not presented one instance in which any of its members has felt so pressured.

Furthermore, UARG does not assert injury based on the EPA's adoption of the Manual *qua* an amendment to sections 70.6(c)(1) and 71.6(c)(1) without providing the notice and comment procedures required by 42 U.S.C. § 7607(d) for any CAA regulation because the Manual constitutes neither a regulation nor an amendment thereto. It is instead an agency policy statement—issued without the signature of any Agency official and applied, it appears, on a purely ad hoc

---

[6] UARG also notes a notice of deficiency issued to the State of Texas, Texas Notice of Deficiency Order, 67 Fed. Reg. 732 (Jan. 7, 2002), a revoked draft *Periodic Monitoring Technical Reference Document* and several regional comment letters—all applying the interpretation under challenge, Brief for Petitioner at 20–23—but it fails to allege any resulting injury.

[7] *See supra* p. 5.

[8] UARG's disavowal is understandable for it would face a serious venue problem if it did challenge the two regional orders since a challenge to a "locally or regionally applicable" action must be brought in the appropriate regional circuit court. 42 U.S.C. § 7607(b).

basis—and in no way binds the Agency or regulated entities. *Cf. Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382–84 (D.C. Cir. 2002) ("Guidance Document" binding both EPA and applicant under Toxic Substances Control Act is, on its face, regulation, not policy statement); *Molycorp v. EPA*, 197 F.3d 543, 545–46 (D.C. Cir. 1999) ("the ultimate focus of the inquiry [is] whether agency action partakes of the fundamental characteristic of a regulation, i.e., that it has the force of law."); *see also Kennecott Utah Copper Corp. v. Dep't of the Interior*, 88 F.3d 1191, 1207 (D.C. Cir. 1996) ("We have interpreted 'regulation' to mean a statement that has 'general applicability' and that has the 'legal effect' of 'binding' the agency or other parties.") (citations omitted). *Compare Panhandle E. Pipeline Co.*, 198 F.3d at 269–70 (FERC opinions rendered moot by settlement although they "offered useful discussions of recurring issues" and may have had future value as policy statements only), *with Appalachian Power*, 208 F.3d at 1023 (because Guidance "reads like a ukase" and "State authorities, with EPA's Guidance in hand, are insisting on [additional monitoring]," document was binding in effect and thus subject to notice and comment requirements). Accordingly, the EPA's interpretation as set forth in the Manual is "merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications," *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974), and does not injure UARG in any imminent or redressable manner.

Furthermore, even if UARG has standing, the claim that it has raised is not ripe for judicial review. Courts are obliged to avoid "entangling themselves in abstract disagreements over administrative policies[ ] and . . . to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs.*, 387 U.S. at 148–49. In determining whether a case is ripe, we consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149. In considering whether an issue is fit for review, "we look to see whether the issue 'is purely legal, whether consideration

of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Clean Air Implementation Project*, 150 F.3d at 1204 (D.C. Cir. 1998) (quoting *Natural Res. Def. Council, Inc. v. EPA,* 22 F.3d 1125, 1133 (D.C. Cir. 1994)). Of these three criteria, the third, at least, is not satisfied. The EPA is currently undertaking a rulemaking to amend section 70.6(c)(1) and 71.6(c)(1). Revisions To Clarify the Scope of Sufficiency Monitoring Requirements for Federal and State Operating Permits Programs, 67 Fed. Reg. 58,561 (proposed Sept. 17, 2002). It would be a waste of judicial resources for us to reach the merits of UARG's petition while the rulemaking is pending. *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) ("The interest in postponing review is powerful when the agency position is tentative. Judicial review [then] improperly intrudes into the agency's decisionmaking process. It also squanders judicial resources since the challenging party still enjoys an opportunity to convince the agency to change its mind.") (citing *Pub. Citizen Health Res. Group v. FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984); *Cont'l Air Lines, Inc. v. CAB*, 522 F.2d 107, 125 (D.C. Cir. 1974) (en banc)).

Finally, we note that UARG is not without remedies to address the present situation. At least until the ongoing rulemaking is complete, UARG, or one of its members, can seek relief from a regional circuit court *if* the EPA takes action affecting a permit pursuant to the challenged interpretation. For this reason, we find no hardship to the petitioner in withholding judicial review. 42 U.S.C. § 7607(b).

For the foregoing reasons, we dismiss the petition for review.

*So ordered.*