**NATIONAL MULTI HOUSING COUNCIL, et al.,**
**Plaintiffs,**

v.

**Alphonso JACKSON, Secretary, Department of Housing and Urban Development, et al., Defendants.**

**Civil Action No. 07–0815 (JR).**

United States District Court,
District of Columbia.

March 28, 2008.

Andrew L. Sandler, Joseph L. Barloon, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, for Plaintiffs.

Harvey L. Handley, U.S. Department of Justice, Washington, DC, for Defendants.

### MEMORANDUM

JAMES ROBERTSON, District Judge.

The plaintiffs here—two landlord groups—complain that the Department of Housing and Urban Development exceeded its statutory authority under Title VI of the Civil Rights Act by adopting a recent "policy guidance." That guidance "clarifies" a long-standing requirement that recipients of funding for Federal programs communicate with program beneficiaries in languages other than English if those beneficiaries have limited English proficiency (LEP). Plaintiffs assert that Title VI prohibits only discrimination on the basis of national origin, not on the basis of language, and that it does not support this kind of "disparate impact" provision. They also complain that the vagueness of the guidance makes compliance overly burdensome, rendering it substantively arbitrary and capricious in violation of the Administrative Procedure Act.

HUD's response is to deny the existence of a case or controversy. On its view, the case is not yet ripe because no enforcement proceedings have been undertaken, and plaintiffs lack standing to challenge a guidance document that only details an existing obligation—neither creating rights or obligations for private parties nor binding the agency's enforcement authority. The agency has thus moved for judgment on the pleadings.

I conclude that, together, the doctrines of standing and ripeness do present an impassable barrier to plaintiffs' claims. The claim that the policy guidance is substantively arbitrary or capricious is unripe because its adjudication would require speculation on the nature of hypothetical enforcement proceedings. Plaintiffs' other two claims—that the statute allows regulation of national origin discrimination, not language discrimination, and that the statute does not allow disparate impact regulations—present purely legal issues under a settled agency policy, and so they are ripe, but plaintiffs lack standing to bring them. The injury of which they complain would not be redressed by the remedy they seek: the obligation of HUD's funding recipients to communicate with their tenants in languages other than English did not arise from the challenged policy guidance and so would survive its invalidation.

### I. Ripeness

Ripeness is a justiciability doctrine designed both to prevent courts from short-circuiting policymaking activity that is not yet complete and to prevent premature adjudication of issues whose just resolution would benefit from further factual development. *See, e.g., Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). The Supreme Court has distilled the necessary inquiry into a three factor test: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry*, 523 U.S. at 733, 118 S.Ct. 1665. Ultimately, the dispositive question is "whether the issues tendered are appropriate for judicial resolution," *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), balancing the benefits of patience for the administrative process against the harms of withholding review.

Concerns about ripeness abate most quickly when the issues presented

are "purely legal question[s]." *See Toilet Goods*, 387 U.S. at 163, 87 S.Ct. 1520. An example would be a claim that "the regulation is totally beyond the agency's power under the statute," which is "the type of legal issue that courts have occasionally dealt with without requiring a specific attempt at enforcement." *See id.* (citing *Columbia Broadcasting System v. United States*, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)); *see also Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C.Cir.2003) (if a petition for review raises a purely legal question, "it is presumptively reviewable"). Such purely legal challenges will be deemed unfit for present judicial resolution only if there is a showing that "the agency or court will benefit from deferring review until the agency's policies have crystallized through the application of the policy to particular facts." *Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 739 (D.C.Cir.1990) (quoting *Eagle–Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C.Cir. 1985)) (internal quotations omitted).

■ On these precedents, plaintiffs' two main complaints, regarding the distinction between national origin and language discrimination and the availability of a disparate impact theory under Title VI, are already ripe for review. The allegation is essentially that regulation of English-only communication as a form of national origin discrimination exceeds the statutory authority granted under Title VI, even as a form of disparate impact regulation, and this raises a purely legal question. It involves the application of no facts, and the agency's position on the issue is settled by long-standing regulation in addition to the current policy guidance. The agency's position on this matter is fully crystallized— or, perhaps, set in concrete—and neither accuracy in adjudication nor flexibility in policy-making will be affected by delaying the issue any longer.

■ Plaintiffs' complaint of substantive arbitrariness and capriciousness in violation of 5 U.S.C. § 706(2)(A) is different. The theory is that the guidance's requirement to communicate in languages other than English is overly burdensome, or vague, or both, and that it imposes prohibitive costs upon landlords. *See* Complaint [1] at ¶¶ 54–55. That argument runs smack into the ripeness doctrine. Perhaps anticipating the argument, HUD explained in the guidance that "the intent of this Guidance is to suggest a balance that ensures meaningful access by LEP persons … while not imposing undue burdens on small business." 72 Fed.Reg. 2740. HUD further explained that the guidance was "designed to be a *flexible* and *fact-dependent* standard," giving various factors that funding recipients should consider in assessing their own compliance. *Id.* (emphasis added). Application of the ripeness doctrine in this context gives the agency the opportunity to show that what it calls "flexibility" is not what the plaintiffs call "vagueness" by allowing the court to abstain from review until a crystallized factual record exists. For their part, the plaintiffs have made no showing that, in their real-world interactions with HUD, the guidance—with its "vague" requirements—is being dangled over their heads like the sword of Damocles. The benefits of abstention for the administrative and adjudicative processes thus far outweigh the harms to the plaintiff, and this cause of action will accordingly be dismissed as unripe.

## II. Standing

■ Although the first two claims are ripe, these plaintiffs lack standing to pursue them because the relief they seek— invalidation of HUD's policy guidance—

would not redress their claimed injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), rendered Article III standing into a three-part inquiry:

> "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Id.* at 560–61, 112 S.Ct. 2130 (internal quotations omitted). This inquiry is not satisfied where a plaintiff challenges an agency publication which is "neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications." *Utility Air Regulatory Group v. EPA*, 320 F.3d 272, 278 (D.C.Cir.2003) (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C.Cir.1974)); *see also Panhandle E. Pipe Line Co. v. FERC*, 198 F.3d 266, 269 (D.C.Cir.1999). Plaintiffs' standing in this case thus turns upon the proper characterization of HUD's policy guidance and its relation to other regulations in causing the particular injury of which they complain.

Because the plaintiffs challenge the substance of the guidance, and not the procedures by which it was promulgated, it is not necessary to inquire broadly into whether HUD's guidance is a substantive regulation or an "interpretive rule." *See* 5 U.S.C. § 553(b). I am sensitive to the concerns that Judge Randolph enunciated in *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020 (D.C.Cir.2000)—namely, that an agency might use "policy guidance" when actually regulating as a way of making law without public comment or as a means of evading judicial review. I also do not doubt that the intent of HUD's guidance was regulatory in the sense that it was meant to menace landlords into compliance by raising the specter of funding termination under certain circumstances. Yet where plaintiffs challenge a particular aspect of a guidance document as exceeding an agency's authority under its authorizing statute, the standing question is not only whether the guidance document was actually a substantive regulation, but whether the substance complained of actually causes—or, whether its invalidation would redress—the particular injury alleged. Answering that question requires an analysis of HUD's guidance in the context of the existing regulatory structure.

The statute in question is Title VI of the Civil Rights Act of 1964, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from ... any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Every federal agency that extends financial assistance is authorized by the statute to effectuate this goal "by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute." 42 U.S.C. § 2000d–1. The statute also requires an agency to advise recipients of their non-compliance and to "determine[ ] that compliance cannot be secured by voluntary means" before terminating funding. *Id.* Thus, non-compliance with the statute or with its expressly authorized regulations does not ever result in "surprise" fund cut-offs: third parties are always given the opportunity to comply with the regulations as the agency is currently

interpreting them before losing their funding.

Only two years into the life of Title VI, the Department of Justice promulgated an implementing regulation endorsing the "disparate impact" theory that these plaintiffs claim to be a violation of the statute. That regulations states that a federally funded program

> may not . . . utilize criteria or methods of administration which have the *effect* of subjecting individuals to discrimination because of their race, color, or national origin, or have the *effect* of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin.

28 C.F.R. § 42.104(b)(2) (published at 31 Fed.Reg. 10265 (July 29, 1966)) (emphasis added). In 1973, HUD adopted the same operative language to govern recipients of funding for "housing, accommodations, facilities, services, financial aid, or other benefits which will be provided under any [funded] program or activity." 24 C.F.R. § 1.4(b)(2)(i) (published at 38 Fed.Reg. 17949 (July 5, 1973)). Thus, a disparate impact theory of discrimination is and has been available under the duly promulgated Title VI regulations of both the Justice Department and HUD for 35 years.

Longstanding Justice Department regulations also expressly require communication between funding recipients and program beneficiaries in languages other than English to ensure Title VI compliance. Regulations provide that

> [w]here a significant number or proportion of the population eligible to be served or likely to be directly affected by a federally assisted program (e.g., affected by relocation) needs service or information in a language other than English in order effectively to be in-

formed of or to participate in the program, the recipient shall take reasonable steps, considering the scope of the program and the size and concentration of such population, to provide information in appropriate languages to such persons.

28 C.F.R. § 42.405(d)(1) (originally published at 41 Fed.Reg. 52669 (Dec. 1, 1976)). Other than the policy guidance now at issue, HUD has not itself enacted a parallel regulation or any other provision explicitly requiring communication with LEP populations in their native languages.

There were no relevant changes to this regulatory structure until 2000, when President Clinton issued Executive Order 13166 directing all Federal agencies to "work to ensure that recipients of Federal financial assistance (recipients) provide meaningful access to their LEP applicants and beneficiaries." 65 Fed.Reg. 50121 (Aug. 11, 2000). That order directed the agencies to a Justice Department guidance document, published the same day, "which sets forth the compliance standards that recipients must follow to ensure that the programs and activities they normally provide in English are accessible to LEP persons and thus do not discriminate on the basis of national origin in violation of title VI . . . and its implementing regulations." *Id.* The Justice Department made clear that the standards in that guidance were an articulation of an existing requirement for funding recipients, not the creation of a new one. The DOJ guidance notes that the "Department of Justice has consistently adhered to the view that the significant discriminatory effects that the failure to provide language assistance has on the basis of national origin, places the treatment of LEP individuals comfortably within the ambit of Title VI and agencies' implementing regulations." 65 Fed.Reg. 50123, 50124 (Aug. 11, 2000) (citing regula-

tions described above). Following the direction in Executive Order 13166, HUD made extensive use of the Justice Department guidance in creating the guidance at issue in this case.

The HUD guidance takes similar pains to identify its function as fleshing out existing responsibilities, rather than creating new ones. It states:

> The purpose of this policy guidance is to assist recipients in fulfilling their responsibilities to provide meaningful access to LEP persons under existing law. This policy guidance clarifies existing legal requirements for LEP persons by describing the factors recipients should consider in fulfilling their responsibilities to LEP persons. The policy guidance is not a regulation, but rather a guide. Title VI and its implementing regulations require that recipients take responsible steps to ensure meaningful access by LEP persons. This guidance provides an analytical framework that recipients may use to determine how best to comply with statutory and regulatory obligations to provide meaningful access to the benefits, services, information, and other important portions of their programs and activities for individuals who are limited English proficient. These are the same criteria HUD will use in evaluating whether recipients are in compliance with Title VI and Title VI regulations.

72 Fed.Reg. 2732, 2738 (Jan. 22, 2007). This self-description is accurate. The HUD guidance offers a "flexible and fact-dependent standard" which balances four factors: (1) the proportion of LEP persons served by the program; (2) the frequency with which they come in contact with the program; (3) the importance of the program for those beneficiaries; and (4) the resources available to the recipient. *Id.* at 2740. This is a malleable standard that

the recipient "should" use in assessing their own compliance, but it does not bind or expand HUD's enforcement or de-funding authority. Ultimately, it is only an expression of the "criteria HUD will use in evaluating whether recipients are in compliance with Title VI and Title VI regulations." *Id.*

■ The guidance is thus not susceptible to a challenge by these plaintiffs. A plaintiff generally lacks standing to challenge a document that, like this policy guidance, is "merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications." *Utility Air Regulatory Group v. EPA,* 320 F.3d 272, 278 (D.C.Cir. 2003). Yet these plaintiffs have an even clearer standing problem because of the nature of their challenge. The legal injuries they assert regarding the availability of language discrimination and disparate impact theories under Title VI do not arise from this guidance at all: it is clear from the foregoing discussion that HUD and Justice have adhered to a disparate impact theory of discrimination under Title VI and its implementing regulations for over 35 years, and that the Justice Department has required funding recipients to communicate with LEP populations in languages other than English for nearly that long. HUD's existing disparate impact regulation provides ample authority for initiating the fund cut-off procedure against recipients who fail to provide translations for LEP beneficiaries because that practice would likely "have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular ... national origin." 24 C.F.R. § 1.4(b)(2)(i). If such an effect were not proven, HUD could not terminate funding, with or without the guidance, because the guidance by its own terms does not create any new obligations.

HUD's intent in promulgating this guidance may indeed have been regulatory—it may have been done to make the requirement more palpable and to encourage greater "voluntary" compliance. Because the relevant behavior would put the plaintiffs at risk of funding termination for Title VI noncompliance with or without the guidance, however, the relief plaintiffs seek would not redress their claimed injury.

An appropriate order accompanies this memorandum.

### ORDER

For the reasons set forth in the accompanying memorandum, defendant's motion to dismiss on the pleadings [10] is **GRANTED.**