# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 8, 2008        Decided August 19, 2008

No. 04-1243

SIERRA CLUB, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN PETROLEUM INSTITUTE, ET AL.,
INTERVENORS

———

Consolidated with
07-1039

———

On Petitions for Review of an Order of the
Environmental Protection Agency

———

*Keri N. Powell* argued the cause for petitioners. With her on the briefs was *David S. Baron. John D. Walke* entered an appearance.

*Cynthia J. Morris*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief was *John C. Cruden*, Deputy Assistant Attorney General.

*Christopher S. Vaden*, *David J. Kaplan*, *Jon M. Lipshultz*, Attorneys, U.S. Department of Justice, and *Nancy A. Ketcham-Colwill* and *Kerry E. Rodgers*, Counsel, U.S. Environmental Protection Agency, entered appearances.

*Lauren E. Freeman* argued the cause for intervenors. With her on the brief were *Charles H. Knauss*, *Leslie S. Ritts*, *Susan Conti*, *Richard S. Wasserstrom*, *William H. Lewis*, and *M. Elizabeth Cox*. *Ralph J. Colleli, Jr.* entered an appearance.

Before: SENTELLE, *Chief Judge*, and GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

GRIFFITH, *Circuit Judge*: The 1990 Amendments to the Clean Air Act compel certain stationary sources of air pollution to obtain permits from state and local authorities that identify all emission limits for the source and also include "monitoring . . . requirements to assure compliance with the permit terms and conditions." 42 U.S.C. § 7661c(c). Sometimes, existing monitoring requirements do not "assure compliance." The Environmental Protection Agency ("EPA") promulgated a rule preventing state and local authorities from supplementing these inadequate monitoring requirements. We vacate this rule because it is contrary to the statutory directive that each permit must include adequate monitoring requirements.

3

# I.

## A.

Under the regulatory regime established by the Clean Air Act ("Act"), emission limits for pollutants and monitoring requirements that measure compliance applicable to any given stationary source of air pollution are scattered throughout rules promulgated by states or EPA, such as state implementation plans, *id.* § 7410, new source performance standards, *id.* § 7411, and national emission standards for hazardous air pollutants, *id.* § 7412. Before 1990, regulators and industry were left to wander through this regulatory maze in search of the emission limits and monitoring requirements that might apply to a particular source. Congress addressed this confusion in the 1990 Amendments by adding Title V of the Act, which created a national permit program that requires many stationary sources of air pollution to obtain permits that include relevant emission limits and monitoring requirements. *Id.* §§ 7661–7661f. Congress intended that EPA and state and local permitting authorities administer the permit program together.[1] Title V gives EPA a supervisory role over the program, which includes the duty to identify its "minimum elements," *id.* § 7661a(b), the power to establish new compliance procedures, *id.* § 7661c(b), and the opportunity to object to permits that do not comply with the Act, *id.* § 7661d(b). State and local authorities are assigned the task of issuing permits in their jurisdictions but can do so only if EPA has approved their proposals for how to implement the permit program. *Id.* § 7661a(d)(1). If a permitting authority fails to propose an acceptable program, responsibility for issuing

---

[1] A "permitting authority" is "the air pollution control agency authorized by [EPA] to carry out a permit program" in a state or local jurisdiction. 42 U.S.C. § 7661(4).

permits falls to EPA. *Id.* § 7661a(d)(3). To date, EPA has issued final approvals to permit programs proposed by more than 100 state and local authorities.

But Title V did more than require the compilation in a single document of existing applicable emission limits, *id.* § 7661c(a), and monitoring requirements, *id.* § 7661c(c). It also mandated that "[e]ach permit issued under [Title V] shall set forth . . . monitoring . . . requirements to assure compliance with the permit terms and conditions." *Id.* As we explain below, there has been much back and forth among EPA, industry, and environmental groups about how "[e]ach permit" must "assure compliance."

**B.**

In 1992, EPA identified the "minimum elements" of the national permit program as the 1990 Amendments required, *see id.* § 7661a(b), by issuing its "Part 70 Rules," *see* 40 C.F.R. pt. 70.[2] Three provisions of the Part 70 Rules are relevant to this matter. Subsection 70.6(a)(3)(i)(A) requires that "[e]ach permit" identify "[a]ll monitoring . . . required under applicable monitoring and testing requirements." But "[w]here the applicable requirement does not require periodic testing," subsection 70.6(a)(3)(i)(B) obliges the permitting authority to add to the permit "periodic monitoring sufficient to yield reliable data from the relevant time period that are representative of the source's compliance with the permit."[3]

---

[2] EPA promulgated materially similar rules to govern instances where the agency, rather than state and local authorities, assumes responsibility for issuing permits. *See* 40 C.F.R. pt. 71. Petitioners also challenge these "Part 71 Rules." Our discussion of the Part 70 Rules applies equally to the Part 71 Rules.

[3] The Part 70 Rules do not define "periodic," but we have indicated that it means "testing from time to time — that is yearly, monthly,

Finally, subsection 70.6(c)(1) — which closely tracks the language of the statute, *see* 42 U.S.C. § 7661c(c) — provides that "[a]ll . . . permits shall contain . . . monitoring . . . requirements sufficient to assure compliance with the terms and conditions of the permit."

For each permit issued, a permitting authority must gather the various emission limits and determine which monitoring requirements accompany them. The Part 70 Rules guide the way. Where an emission standard already specifies a monitoring requirement that is both "periodic" and sufficient to assure compliance, the permitting authority simply includes that requirement in the permit. 40 C.F.R. § 70.6(a)(3)(i)(A). Where the emission standard lacks a periodic monitoring requirement altogether, the permitting authority must create one that assures compliance and include it in the permit. *Id.* § 70.6(a)(3)(i)(B). There is no controversy over what the permitting authority should do in either of these scenarios.

But how should a permitting authority respond to an emission standard that has a periodic monitoring requirement inadequate to the task of assuring compliance? For example, suppose there is a standard that limits emission from a given stationary source to *X* units of pollutant per day. Suppose also that the standard requires annual monitoring. Where *annual* testing cannot assure compliance with a *daily* emission limit, may the permitting authority supplement the monitoring requirement "to assure compliance with the permit terms and conditions," as the Act commands? 42 U.S.C. § 7661c(c).

---

weekly, daily, hourly." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000). An annual monitoring test would be periodic, but a one-time test would not.

EPA's answer to this question, what we shall call the "third scenario," has shifted over time.

EPA first engaged with this issue in 1997, when the agency took the position that state and local permitting authorities could supplement periodic monitoring requirements that failed to assure compliance. *See* Letter from Winston A. Smith, Director, Air, Pesticides & Toxics Mgmt. Div., EPA, to Howard L. Rhodes, Director, Air Res. Mgmt. Div., Fla. Dep't of Envtl. Prot. (Dec. 11, 1997) (rejecting permits interpreting Part 70 Rules to forbid supplementation). EPA memorialized this interpretation in a 1998 Guidance that construed 40 C.F.R. § 70.6(a)(3)(i)(B) to allow supplementation by state and local permitting authorities. *See* PERIODIC MONITORING GUIDANCE. Subsection 70.6(a)(3)(i)(B), which on its face appeared only to cover the circumstance where no periodic monitoring had been required, was now read to include the third scenario where periodic monitoring was required but was inadequate. Industry groups petitioned this court for review of the Guidance. Their principal argument was that the Guidance unlawfully expanded § 70.6(a)(3)(i)(B) without following notice-and-comment procedures. In the alternative, they argued that § 70.6(a)(3)(i)(B) conflicted with the Act. We vacated the Guidance because it unlawfully broadened § 70.6(a)(3)(i)(B) without following proper procedures. *Appalachian Power v. EPA*, 208 F.3d 1015, 1028 (D.C. Cir. 2000). We did not, however, speak to whether § 70.6(a)(3)(i)(B) or any other provisions in the Part 70 Rules violate the Act.

Undeterred, the agency turned from 40 C.F.R. § 70.6(a)(3)(i)(B) to § 70.6(c)(1). In two decisions objecting to permits, EPA found in § 70.6(c)(1) authority for state and local permitting authorities to supplement inadequate

monitoring requirements. *See* Order Denying in Part and Granting in Part Petition for Objection to Permit, *In re Fort James Camas Mill*, Petition No. X-1999-1 (Dec. 22, 2000); Order Partially Granting and Partially Denying Petition for Objection to Permits, *In re PacifiCorp's Jim Bridger and Naughton Electric Utility Steam Generating Plants*, Petition No. VIII-00-1 (Nov. 16, 2000). An industry group petitioned for review of EPA's interpretation of § 70.6(c)(1), but we dismissed the challenge on jurisdictional grounds. *Util. Air Regulatory Group v. EPA*, 320 F.3d 272 (D.C. Cir. 2003) (dismissing petition for review on standing and ripeness grounds).

In 2002, EPA proposed a regulation codifying this view of § 70.6(c)(1). The agency issued an advance notice of the rule, 67 Fed. Reg. 58,561, 58,564 (Sept. 17, 2002), and a sixty-day interim rule during the notice-and-comment period, 67 Fed. Reg. 58,529 (Sept. 17, 2002). But after an industry group challenged the sixty-day rule, *see Util. Air Regulatory Group v. EPA*, No. 02-1290 (D.C. Cir. filed Sept. 18, 2002), EPA had a change of view. Rather than defend the proposed rule, the agency settled the litigation by agreeing to adopt a final rule that would interpret § 70.6(c)(1) to *prohibit* state and local permitting authorities from supplementing inadequate monitoring requirements. *See* 68 Fed. Reg. 65,700, 65,701 (Nov. 21, 2003). This new rule would revise EPA's answer for the problem of the third scenario.

In 2004, EPA issued a rule to this effect, which provided that nothing in the Part 70 Rules authorized permitting authorities to supplement inadequate monitoring requirements. *See* 69 Fed. Reg. 3202 (Jan. 22, 2004). EPA resolved that it alone would remedy inadequate monitoring requirements by undertaking a "programmatic" strategy. *See id.* Pursuant to this strategy, EPA would identify inadequate

periodic monitoring requirements and, rather than address their deficiencies in each permit, would issue rulemakings enhancing them to "assure compliance." We vacated this 2004 rule because EPA had not allowed for notice and comment. *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005). In response, EPA issued notice and sought comment on a proposed rule that was identical. 71 Fed. Reg. 32,006 (June 2, 2006). In December 2006, EPA adopted the rule. 71 Fed. Reg. 75,422 (Dec. 15, 2006) ("2006 rule").

Several environmental groups challenge the 2006 rule and the monitoring provisions of the 1992 Part 70 Rules, *see* 40 C.F.R. §§ 70.6(a)(3)(i)(A), (a)(3)(i)(B), (c)(1), arguing that they violate the Clean Air Act and are arbitrary and capricious. Several industry groups have intervened on behalf of EPA. We have jurisdiction to consider these petitions for review. 42 U.S.C. § 7607(b)(1).

## II.

We first consider whether EPA's 2006 rule violates the Clean Air Act. Because Congress has charged EPA with administering Title V, *see* 42 U.S.C. § 7661a(b), our inquiry is governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). If the Act unambiguously authorizes or forecloses EPA's 2006 rule, step one of the *Chevron* analysis requires that we follow Congress's express policy choice. If the Act is unclear on the matter, step two of *Chevron* requires that we defer to EPA's reasonable interpretation. *Id.* at 842–43. We hold, under step one of *Chevron*, that Title V of the Act unambiguously

precludes EPA's interpretation in the 2006 rule. Accordingly, we vacate the 2006 rule.[4]

Title V is a complex statute with a clear objective: it enlists EPA and state and local environmental authorities in a common effort to create a permit program for most stationary sources of air pollution. Fundamental to this scheme is the mandate that "[e]ach permit . . . shall set forth . . . monitoring . . . requirements to assure compliance with the permit terms and conditions." 42 U.S.C. § 7661c(c). By its terms, this mandate means that a monitoring requirement insufficient "to assure compliance" with emission limits has no place in a permit unless and until it is supplemented by more rigorous standards. *Cf.* EPA Br. at 29 ("EPA recognizes that the monitoring required by some rules . . . — particularly, those that pre-date the 1990 . . . Amendments — may not be adequate to assure compliance and should be improved.").

Title V gave EPA two ways to comply with this requirement. First, EPA could have fixed all inadequate monitoring requirements through the rulemaking process before any permits issued under the new national permit program. 42 U.S.C. § 7661c(b). EPA declined such an undertaking. Second, EPA could have authorized permitting authorities to supplement inadequate monitoring requirements on a case-by-case basis in each permit issued. EPA has been of two minds on this option. As we have already described, for many years the agency chose this as the best way to comply with the Act. In the 2006 rule and the litigation that preceded it, however, EPA reversed course and prohibited

---

[4] Because we strike the 2006 rule on this ground, we do not consider petitioners' argument that the rule is also arbitrary and capricious.

state and local permitting authorities from exercising this power.

EPA's about-face means that some permit programs currently in place do not comply with Title V because the agency failed to fix inadequate monitoring requirements before new permits issued, and prohibited state and local authorities from doing so. State and local authorities have issued more than 16,000 permits since the 1990 Amendments, and because stationary sources must renew their permits at least every five years, *id.* § 7661a(b)(5)(B), thousands more will issue while EPA completes its programmatic strategy. Many of those permits will fail to comply with the Act because their monitoring requirements are inadequate. If Congress meant that potentially thousands of permits could be issued without adequate monitoring requirements, then it would not have said "*[e]ach permit* . . . shall set forth . . . monitoring . . . requirements to assure compliance with the permit terms and conditions." *Id.* § 7661c(c) (emphasis added). There can be no doubt about the plain meaning of this phrase. "Each" means "[e]very one of a group considered individually." AMERICAN HERITAGE DICTIONARY 269 (4th ed. 2001). Title V requires that "[e]very one" of the permits issued by permitting authorities include adequate monitoring requirements. Any other conclusion would run counter to Justice Frankfurter's timeless advice on statutory interpretation: " '(1) Read the statute; (2) read the statute; (3) read the statute!' " *In re England*, 375 F.3d 1169, 1182 (D.C. Cir. 2004) (Roberts, J.) (quoting HENRY J. FRIENDLY, BENCHMARKS 202 (1967)).

EPA and the industry intervenors marshal several arguments in support of the 2006 rule. First, they argue that the Act's "[e]ach permit" mandate is not as sweeping as it seems, and in fact bars permitting authorities from adding

monitoring requirements, because the Act's next sentence says: "Such monitoring . . . requirements shall conform to any applicable regulation under [§ 7661c(b)]." 42 U.S.C. § 7661c(c). Section 7661c(b) allows EPA to promulgate monitoring requirements. Taken together, the argument goes, these provisions limit the creation of new monitoring requirements to EPA alone. We disagree. Had EPA used its § 7661c(b) power to fix inadequate monitoring requirements *prior to the issuance of any permits*, those newly-adequate requirements would bind state and local authorities under § 7661c(c). But EPA did no such thing. Similarly, where EPA fixes inadequate monitoring requirements pursuant to § 7661c(b) after permits began to issue, permits will have to "conform to" those updated requirements. *Id.* § 7661c(c).[5] At least for some inadequate monitoring requirements, however, EPA has offered nothing more than vague promises to act in the future. Under the "[e]ach permit" mandate, state and local authorities must be allowed to cure these monitoring requirements before including them in permits.

Along these lines, our dissenting colleague argues that EPA has already stamped all pre-existing monitoring requirements as adequate "to assure compliance," and that permitting authorities may not supplement those requirements. Were that true, this would be a harder case, presenting the question of "Who Decides?" Dissenting Opinion at 2. But EPA has not decided that all pre-existing monitoring requirements "assure compliance." Quite the opposite, the agency concedes that some monitoring requirements "may not be adequate to assure compliance and should be improved," EPA Br. at 29, and promises to fix them

---

[5] EPA has already done this with respect to some inadequate monitoring requirements. *See* EPA Br. at 52 (describing recent enhancements to pre-1990 inadequate monitoring requirements).

in the future. The question in this case is whether permitting authorities may supplement inadequate monitoring requirements when EPA has taken no action. We read Title V to mean that somebody must fix these inadequate monitoring requirements. We leave for another day the question of who wins when EPA and state and local permitting authorities conflict over whether a given requirement is sufficient "to assure compliance," because the question is not presented in this case.

Second, EPA and the intervenors contend generally that it would be imprudent to allow state and local authorities to supplement inadequate requirements. Their contentions can be grouped into two lines of argument. On the one hand, they argue that allowing supplementation by state and local authorities would contradict the Act's design. They suggest that allowing such supplementation would create new emission standards not authorized by the Act, and would undermine the Act's judicial-review provision, *id.* § 7607(b)(1), by giving two bites at the apple to parties who want more stringent environmental regulations. On the other hand, they argue that allowing supplementation by state and local authorities would be bad policy. There is no need for permitting authorities to supplement inadequate requirements, they say, because those authorities can pass more stringent requirements through state and local legislation. In any case, they maintain, EPA's programmatic approach would be more consistent, more efficient, more publicly accountable, and less burdensome than allowing permitting authorities to supplement inadequate requirements on a case-by-case basis. But neither of these lines of attack is persuasive because both share the same flaw — they attempt to sidestep the unambiguous "[e]ach permit" mandate of the Act. Appeals to the design and policy of a statute are unavailing in the face of clear statutory text. As Chief Justice Roberts wrote while a

member of this court, "when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms." *In re England*, 375 F.3d at 1177 (quotation marks omitted).

Finally, EPA and the intervenors argue that we must uphold the 2006 rule because *Appalachian Power* suggested that the Act does not authorize state and local authorities to supplement inadequate monitoring requirements. That is simply incorrect. In that case we set aside an EPA Guidance interpreting the Part 70 Rules, holding that the agency's broad interpretation of 40 C.F.R. § 70.6(a)(3)(i)(B) effectively amended that subsection without adhering to required rulemaking procedures. 208 F.3d at 1028; *cf.* EPA Br. at 46 (admitting that *Appalachian Power* "was ultimately decided on procedural grounds"). We had no occasion in *Appalachian Power* to determine, as we must here, whether the Act allows supplementation by permitting authorities of inadequate monitoring requirements.

## III.

Independent of their challenge to the 2006 rule, petitioners also seek review of the monitoring requirements of the Part 70 Rules, arguing that if those provisions forbid permitting authorities from supplementing inadequate monitoring requirements, they too must be vacated. As we explained in our earlier *Chevron* analysis, the Clean Air Act requires such supplementation. Accordingly, the Part 70 Rules may be upheld only if they can be read consistent with that mandate. Because the Part 70 Rules can be so read, we uphold them.

"[A]n agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulations being interpreted." *Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2349 (2007) (quotation marks omitted). Because we have set aside the 2006 rule as conflicting with the Act, EPA's interpretation of the Part 70 Rules does not control. *See Hazardous Waste Treatment Council v. Reilly*, 938 F.2d 1390, 1395 (D.C. Cir. 1991) (explaining that an agency's interpretation of its own regulations must "meet the test of consistency with the underlying statute"). Turning to the Part 70 Rules themselves, we conclude that their monitoring provisions are consistent with the Act because they can be easily and reasonably read to allow state and local permitting authorities to supplement inadequate monitoring requirements in each permit issued.

Neither § 70.6(a)(3)(i)(A) nor § 70.6(a)(3)(i)(B) allows state and local authorities to supplement inadequate monitoring requirements, so the question is whether § 70.6(c)(1) does. That provision states that "[c]onsistent with [§ 70.6(a)(3)]," all permits "shall" contain "monitoring . . . requirements sufficient to assure compliance with the terms and conditions of the permit." The meaning of this subsection is not immediately evident. One option is that § 70.6(c)(1) does nothing more than repeat the requirements of § 70.6(a)(3)(i)(A) and § 70.6(a)(3)(i)(B). This reading finds support in the phrase "[c]onsistent with [§ 70.6(a)(3)]." But we are reluctant to adopt this interpretation because it would run afoul of a basic canon of construction. As the Supreme Court has instructed, "It is [a court's] duty to give effect, if possible, to every clause and word of a statute . . . ." *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (quotations and citations omitted). The same is true for regulations. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.

Ct. 2518, 2535–36 (2007) ("[W]e have cautioned against reading a text in a way that makes part of it redundant.").

To save § 70.6(c)(1) from becoming surplusage, we must interpret the provision to require something beyond what is already required by § 70.6(a)(3)(i)(A) and § 70.6(a)(3)(i)(B). The most reasonable reading is that it serves as a gap-filler to those provisions. In other words, § 70.6(c)(1) ensures that all Title V permits include monitoring requirements "sufficient to assure compliance with the terms and conditions of the permit," even when § 70.6(a)(3)(i)(A) and § 70.6(a)(3)(i)(B) are not applicable. This reading provides precisely what we have concluded the Act requires: a permitting authority may supplement an inadequate monitoring requirement so that the requirement will "assure compliance with the permit terms and conditions." Because § 70.6(c)(1) can be reasonably read this way, we uphold the monitoring provisions of the Part 70 Rules as consistent with the Act.[6]

## IV.

We grant the petition for review with respect to the 2006 rule, which we vacate. We deny the petition for review with respect to the monitoring provisions of the Part 70 Rules.

*So ordered.*

---

[6] And because we read the Part 70 Rules to allow supplementation of inadequate monitoring requirements, we need not consider petitioners' argument that those rules would be arbitrary and capricious if they prohibited supplementation.

KAVANAUGH, *Circuit Judge*, dissenting:   I agree completely with the majority opinion about bedrock principles of statutory interpretation.   The plain meaning of the text controls; courts should not strain to find ambiguity in clarity; courts must ensure that agencies comply with the plain statutory text and not bypass *Chevron* step 1.   And I strongly align myself with the majority's quotation from Justice Frankfurter about the best tool of statutory interpretation:   "Read the statute; (2) read the statute; (3) read the statute!"  Maj. Op. at 10.

In this case, however, I respectfully part ways with the majority opinion because the relevant statutory language supports EPA's 2006 rule.

Under the Clean Air Act, state and local authorities issue permits for certain sources that emit air pollution.   The permits must list the pre-existing emission limits and the pre-existing "monitoring . . . requirements to assure compliance" with the emission limits.   42 U.S.C. § 7661c(c); *see also* § 7661c(a).   Importantly, by regulation, those emission limits and monitoring requirements are not created by state and local permitting authorities at the time they issue the permits. Rather, the permit is simply a device that lists in one "source-specific bible for Clean Air Act compliance" pre-existing emission limits and monitoring requirements, including those set forth by pre-existing EPA-approved state implementation plans (SIP), EPA-dictated New Source Performance Standards (NSPS), EPA-generated National Emission Standards for Hazardous Air Pollutants (NESHAP), and other applicable requirements.   *Virginia v. Browner*, 80 F.3d 869, 873 (4th Cir. 1996); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1026-27 (D.C. Cir. 2000).

The dispute in this case boils down to the following: When issuing permits, can state and local permitting authorities independently determine whether, in their view,

those pre-existing monitoring requirements are sufficient "to assure compliance" with emission limits – and if they think not, impose additional monitoring requirements? The legal question here is: Who Decides? According to petitioners, the statute says that state and local permitting authorities can decide on their own to impose additional monitoring requirements as they see fit. EPA responds that it possesses the statutory authority and discretion to decide whether state and local permitting authorities can impose additional monitoring requirements.

The statutory text resolves that question; the statute grants EPA the authority to determine whether state and local permitting authorities can impose additional monitoring requirements. The text says that the monitoring requirements listed in the permit "shall conform to any applicable regulation under subsection (b) of this section." § 7661c(c). In turn, subsection (b) says EPA "may by rule prescribe procedures and methods for determining compliance *and for monitoring* and analysis of pollutants regulated under this chapter . . . ." § 7661c(b) (emphasis added).

Exercising its authority under this rather straightforward statutory scheme, EPA has decided that pre-existing periodic monitoring requirements (for example, in the SIP, NSPS, and NESHAP) are to "assure compliance" with emission limits and that state and local permitting authorities may not add new periodic monitoring requirements when issuing permits. EPA has allowed one exception: If there are no periodic monitoring requirements set forth in the pre-existing applicable requirements, state and local permitting authorities not only can but *must* add periodic monitoring requirements to permits. 40 C.F.R. § 70.6(a)(3)(i)(B).

To be sure, EPA and the state and local permitting authorities (and outside interest groups) might disagree about whether the pre-existing monitoring requirements listed in the permit will "assure compliance" with the relevant emission limits. But pursuant to its statutory authority, EPA has determined that the permitting process is not the time and place for state and local permitting authorities to add new periodic monitoring requirements. Rather, if changes are to be made to the underlying monitoring requirements, they should occur during the process for formulating and revising SIP, NSPS, NESHAP, and other applicable requirements.

I therefore would reject petitioners' primary statutory argument.[*]

For its part, the majority opinion says it need not resolve the broad question raised by petitioners whether EPA must allow state and local permitting authorities to add new periodic monitoring requirements when issuing permits. Maj. Op. at 11-12. The majority instead resolves this case on more limited grounds, based on a factual wrinkle in this case. According to EPA, there is a narrow group of pre-existing applicable monitoring requirements (primarily from before 1990) that may not assure compliance with emission limits. EPA has determined that any such shortcomings should be resolved by rule or through revisions to the underlying SIPs, for example, not by state and local permitting authorities

---

[*] Taking a different position from petitioners or EPA, the industry intervenors argue that the statutory text actually *prohibits* EPA from allowing state and local permitting authorities to impose additional monitoring requirements when issuing permits. I disagree with industry intervenors for the same reason that I disagree with petitioners. The statute gives EPA the discretion to decide this question; the statutory text does not mandate a particular answer.

during the permitting process. EPA's approach to this problem is consistent with the overall statutory and regulatory scheme, which indicates that the permitting process is generally not the vehicle for making substantive monitoring decisions; again, the permit simply lists the pre-existing monitoring requirements and emission limits in one place. I thus find nothing in the statute that prohibits EPA's approach to fixing any inadequate pre-existing monitoring requirements.

The majority's contrary decision is narrow and appears to allow state and local permitting authorities to add periodic monitoring requirements only in those cases where EPA itself concludes that the pre-existing applicable monitoring requirements are not adequate and EPA has taken no action. That is likely to be a small percentage of overall permit decisions. But because I conclude that the challenged EPA rule is entirely consistent with the statutory text and is otherwise reasonable, and because petitioners' other challenges are not persuasive, I would deny the petition in whole. I respectfully dissent.